## AMERICAN NAT. BANK OF OKMULGEE v. KING et al.

No. 21394. Opinion Filed Feb. 2, 1932.

Rehearing Denied July 27, 1932.

Embry, Johnson, Crowe & Tolbert, Cochran & Noble, and Arthur H. McLain, for plaintiff in error.

Howard Lee Smith and R. A. Hockensmith, for defendants in error.

KORNEGAY, J. This is a proceeding in error brought to review the action of the district court of Oklahoma county refusing to allow the plaintiff in error, the American National Bank of Okmulgee, Okla., to share in the proceeds of two insurance policies on the life of Tom King, that were payable to his widow, Pearl T. King, and his minor children, Tom King, Jr., and Margaret King.

King, for a long time, had been in the banking business in Oklahoma. He was a bank examiner at one time. He had filled stations in the banks at Ada, Durant, and Okmulgee. He married the defendant in error Pearl T. King, in the year 1909, at Honey Grove, Tex. He did business in the state of Oklahoma, and was cashier for a while of the plaintiff bank, and was its president when he died. He was at each premium payment time, according to this evidence, a defaulter, shortage for which he was responsible in 1924 being $22,670.99. The shortage on May 16, 1929, by his confession, was $221,000. It had been gradually increasing, though cut down once on September 15, 1926, about $2,000.

As to what went with the money, the record does not show. He was evidently engaged in speculation in oil leases and on the board of trade. He had the confidence of the other officers of the bank, and all seemed to have had the privilege of overdrawing at times. He carried in the bank a personal account, and from time to time he made deposits in said account aggregating thousands of dollars.

Evidently King was a very skillful manager of banks and of men. He had the unusual faculty of knowing how to escape the scrutiny of the national bank examiners by manipulating the accounts of the larger depositors. The evidence shows that most of this was in the account of the treasurer of Okmulgee county, and that the bank was paying interest on such deposits. He evidently was a skillful enough bookkeeper that he could carry two sets of books in part, covering various accounts, which he did for several years, escaping the bank examiners and not arousing suspicions of his associates, except the bookkeeper. Sometimes the shortage would be in one account, sometimes in another. Sometimes it would be in the "cash," as it is called, though

this lacked a great deal of being cash as it turned out later, most of it being memoranda.

The bookkeepers testified that they were under King, and he instructed them not to report things that should have been reported. As far as the bank inspectors were concerned, he was able to make the books balance with reasonable precision. He often "kited." Sometimes his "kites" were in some of the neighboring banks, sometimes in some farther away. The Bank Examiner, following the usual custom, sent out "tracers," and got replies saying that the books of the depositor balanced with the books of the bank. However, on one occasion, the evidence shows unquestionably that the force in the treasurer's office of Okmulgee county did not make true answers, answering that the books balanced when they were several thousand dollars off of balance. Just how the others acted the record does not show.

The record is very voluminous, the casemade embracing 4,914 pages, and the briefs concerning it 925 pages. The briefs are largely a recapitulation of what appears in the case-made.

Two probable places of expenditure of the shortage are indicated in the record, one being the family expense account, and the other the probable board of trade transactions made in the name of a business associate, who testified he knew nothing of the transactions. The income tax reports were introduced in evidence, showing practically no net income for the last three or four years of the man's life, and the last income tax report was made just a few days before he killed himself. He, on May 16, 1929, confessed his shortage being $221,000, and made a memorandum showing where it was, and claimed that he had spent the money, but did not say for what. He was supposed to meet his board of directors for a conference, some of whom had been called in from distant places, but he was not able to do so. He was found in an automobile, just outside his garage, dead by his own hand.

He had been trusted with several estate matters, according to the record, and among others was the Bruner estate, and there was in his possession at the time bank looseleaf ledger sheets concerning this Bruner estate, photographic copies of which appear in the record smeared with his blood. This was one of the accounts that was manipulated. The history of the Bruner account appears in part in the record.

During the night of King's death, arrangements were made with the Central National Bank of Okmulgee to take over the assets of the American National Bank and to pay off the depositors. Examinations were had by the federal inspectors, as well as by private inspectors, and places where the shortages existed were reasonably located in the voluminous record that we have, and also the deductions were made that the actual shortage was $14,000 approximately more than the confessed shortage. However, had there been fewer objections by the lawyers, and had the attorneys gone over the books of the bank with the purpose of ascertaining the exact shortage, such ascertainment probably would have been accomplished in far less time than it took to try the case and with far less expense. Lengthy findings were made by the court below. Still longer findings were requested by the parties.

The theory of the plaintiff bank in bringing the action evidently was not that of being a creditor, as it did not see fit to probate its claim against the estate, but that of commingling of trust funds and getting the funds back with profits. However, all parties appear to have overlooked the fact that what made the fund here was the death of the insured by the force of a self-directed pistol shot. Prior to that time he had taken out some life insurance based on his own death, and matured thereby, the proceeds being the subject-matter of controversy here. The evidence shows that all of the premiums for the insurance had been paid by checks on the bank, drawn by him on his personal account while he was cashier or president. The account was continuing, sometimes showing a balance, sometimes being overdrawn. The last balance, as shown by the books in favor of King, was April 18, 1929, showing a balance of $194.28. The next day it was overdrawn $265.57, the overdrafting gradually increased to $7,275.25 on May 9th, reduced next day to $6,525.25, from which time it gradually increased to $6,672.57 on May 13th, reduced next day to $6,225.58, and then gradually increased to $7,530.83 on May 16th, on which day he died. At the same time the evidence shows beyond peradventure that had he been charged at any time with the amount of the defalcation, of which he was cognizant, there never would have been anything to his credit in the bank. The theory of the plaintiff bank is that if it can establish that the bank's money paid the premiums, it gets the insurance, overlooking the fact that it took the death of King to mature the contract of insurance and create the fund. Applying a term ordinarily used in personal injury cases, the "proximate cause" of converting the policy into an actual liability was the act of the deceased in firing the shot that caused his death. It also overlooks the fact that the first call upon King's life was a natural call of the wife and minor children, whose claims antedated the claims of the bank. The claim is that the bank is entitled to the proportion of the fund that the amount of premium money paid with the funds of the bank bears to the total premiums paid. Had the bank sought to recover the money actually embezzled, a good deal of the testimony dealing in details would have been highly essential. But that was not the theory. The theory was that its money paid the premiums, and therefore it was entitled to the fund derived from the death, though premature and self-inflicted.

The lower court found that all the premium money paid was honestly acquired by the deceased. The presumption is in favor of honesty and that a man, in paying for his life insurance, would be paying with money that was honestly acquired. If one should hold that King, defaulting from the start, never had any money to pay with until his shortage was satisfied, and thereby adopt the theory of the plaintiff bank, all of the money paid for premiums in this case would belong to the bank, and the dependent wife and children, bound by the closest ties in this world with the life of the dead man, would get nothing by reason of his sacrifice of that life. It would all go to the place whence the premium payments came.

It seems to be admitted by the plaintiff in error that some of the premiums might have been honestly paid, though a great deal of labor has been expended in framing, through the medium of accountants and experts, a statement as to the overdrafts that ought to have existed, as well as those that did openly exist in the personal account of King, and the deduction is made that the bank is entitled to part of the insurance. The lower court found it was entitled to none.

There have been some cases cited on the proposition of commingling funds and trustees and following trust funds, and a good deal said about trusts "ex maleficio." We think that the cases cited on that line are not bad when properly applied. Of course, if a man should embezzle the money of a bank and put it into mules or automobiles

or any other tangible property, it goes almost without saying that the bank could elect to follow the investment of its money and recover it by following the proceeds, but that is not this case. Perhaps, as a means of deterrent punishment, the increase in a herd of cattle might be claimed by the money owner in case of involuntary investment. The proceeds of the bank's money, these being old line insurance companies, if any it had in premium payments, went into what is known as the reserve or surrender value, which in policies of two year old age would amount to a very small amount of the premium, increasing relatively as the years increase. Had the plaintiff bank elected to proceed on that theory and had established such a payment, there would have been justice in letting them have the portions of premiums reserved. There would have been justice in letting the bank have out of the fund the money that was taken from the bank to pay the life insurance premiums, as they went along, with legal interest. But beyond that natural justice does not go. On a basis of commingling funds and putting them into a common receptacle, producing other funds impressed with a trust, the most that the bank had was some money. If we apply the "bag" theory, discussed in the briefs, there was contained therein the premiums and the sacrifice of a human life, that the bank had no control over and no mortgage on. There were a wife and two minor children dependent on the continuation of that life for care and protection, the one at the hands of a husband, the others of a father. They scarcely compare, and the cases that have undertaken to hold that, in a case of life insurance fund distribution it is purely a matter of premium payment, should be few and far between. They would have to disregard that which is ordinarily classed as most valuable and sacred, a valuable consideration of the highest magnitude.

We have reviewed the cited cases, and this case, undoubtedly, according to the tabulations and the classifications made by the expert accountants, was brought in the light of the declarations contained in an opinion in the case of Vorlander v. Keys, 1 Fed. (2d) 67. It was decided on the 8th of September, 1924. So much reliance is placed upon that case that as an appendix to the brief the plaintiff in error in this case has added the testimony, and insistence is made that the case is on "all fours" with the case we have here, and the testimony in narrative form of some of the bank employees in that case is quoted. In that

case the bank was closed in 1920, and was converted into a national bank in 1919, and was largely what is sometimes called a "one man bank." The man's name was Christian Vorlander, who had been president of the state bank before its conversion. He killed himself on August 11, 1920, and he wrote a note to his family telling them he had not stolen anything. The bookkeeper claimed that he knew nothing about any trouble in the bank, and the receiver said he found that part of the premiums had been paid with the bank's money and part of them with the funds of the insured. The statement as to spurious credits, set out therein, appears in large measure to be a model for what is called questionable credits here. The statement there shows that the overdraft started on the 25th of April, 1917, and that after April 25, 1917, there was an overdraft of $596.94, which increased and decreased, and that premiums were paid after that by charges in the account, the overdraft increasing all the time, and excerpts from the brief of the receiver are set out at pages 418 and 419 of the brief of the plaintiff in error, and the following is an extract from the brief of the winning party:

"Here it is argued that even though every premium has been paid by the money of the cestui que trust, he is to have a lien only for his money. Consequently, when the money had gone into a straight life policy with no surrender value (as is often the case), the cestui que trust, to get his money back, would have to carry the policy to maturity at the risk of a cost greater than the face of the policy, the trustee meanwhile remaining insured to whatever extent the risk might prove unprofitable to the insurer. Such unjust and absurd results would often follow should the courts not let the cestui que trust take all the insurance or pro rate as the case may be. And it would be the reverse of the rule in other cases of commingling. There the trustee and cestui que trust pro rate if the mass is so large that each can get his out; and if it is not the cestui que trust takes all of his and the shortage is considered already taken out of the trustee for himself (see authorities cited)."

A review is had by the brief maker of a lot of cases that appear to hold absolutely the opposite to what he cited them to establish. Judge Sanborn reviews the cases cited by both parties, but he evidently overlooks the fact that what created the fund was not the money that was paid on the premiums alone, but the destruction of a life, at a time when the prolonging of the life would have resulted probably in imprisonment and a forfeiture of a large part of

what had already been paid by reason of unwillingness or inability to pay further. Evidently death created the fund here. Had King lived, and had the federal authorities used their usual vigor in the prosecution of the persons concerned in national bank defalcations, his earning capacity would have ceased absolutely, and the reserve on the policies would probably have been all that could have been recovered from the bank's involuntary investment, if such there was. It is therefore clear that the basis of calculation of the rights of the parties, as insisted on, leaves out the main thing that created the fund. One is reminded of the plight of the unfortunate Merchant of Venice, as portrayed by the great dramatic writer. The man who furnished the money was held not entitled to his debtor's blood. Perhaps it might be likened to a dramatization of Hamlet, Prince of Denmark, with the character of Hamlet left out.

The insured was a married man. He was the father of two minor children. He had provided a contract of insurance on his life for their benefit. In order to mature that contract and make it of any appreciable value, death must ensue. In his dilemma, he sacrificed his life. As a result of that sacrifice the company became liable. We think that the interests the wife and children had in the matter far outweighed what the bank had invested, if it should be established that the bank's money paid the premiums in their entirety.

In the present case, the wife and children, by the laws of nature, have an equitable right to practically all the fund created, as we view it, by the life sacrificed by the husband and father. They have the legal right, as it is payable to them. If the trust theory is to be appealed to, there must be considered trusts "ex beneficio recepto," as well as those "ex maleficio." Upon the basis of proration, what the bank furnished would be infinitesimal as compared with the sacrifice made by the insured for the benefit of his loved ones. If the bank actually did furnish the premiums required, when it gets its money with legal interest it has full measure "and running over," but it is not content with that. It here demands a profit, as it is called, in one aspect of the case. We do not think it would be just to allow that. It has not waged its battles on the theory that it was a creditor of Tom King, but on the theory that its money made the fund, which is small in comparison. Every-

one knows that the main thing that created the fund was the suicide of the deceased.

If the Vorlander Case, relied upon, is authority for the position taken by the bank here, we cannot follow it to that extent. We prefer to follow the cases that it attempted to distinguish that are full of the doctrine that human life is worthy of consideration, equally with property. We prefer to follow the doctrine laid down by the Supreme Court of the United States in Bank v. Hume, 128 U. S. 195, 32 L. Ed. 373, and by the Minnesota Court in Ross v. Minnesota Mutual Life Ins. Co., 154 Minn. 186, 191 N. W. 428, 31 A. L. R. 46, and by a former member of this court, now on the federal bench, in case of Brown v. Home Life Insurance Co., 3 Fed. (2d) 661, though, for the purpose of this case, we do not care to rest the decision upon the state statute, but we think that whoever comes into a court of equity must do equity and must be prepared so to do. The Brown Case was decided on a positive statute. The statute, however, that we have, indicates just how far the creditor can go in sharing in the proceeds derived from a life insurance fund, namely, to the recovery of premiums actually paid. Sections 6726 and 6727, C. O. S. 1921, are the statutes referred to, and are as follows:

"6726. Beneficiary may sue—rights of creditors. When a policy of insurance is effected by any person on his own life, or on another life in favor of some person other than himself having an insurable interest therein, the lawful beneficiary thereof, other than himself or his legal representative, shall be entitled to its proceeds against the creditors and representatives of the person effecting the same; and the person to whom a policy of life insurance is made payable may maintain an action thereon in his own name: Provided, that subject to the statute of limitations, the amount of any premiums for said insurance paid in fraud of creditors, with interest thereon, shall inure to their benefit from the proceeds of the policy; but the company issuing the policy shall be discharged of all liability thereon by payment of its proceeds in accordance with the terms thereof unless, before such payment, the company shall have written notice by or in behalf of some creditor, with specifications of the amount claimed, claiming to recover for certain premiums paid in fraud of creditors: Provided, that the insured, under such policy shall not be denied the right to change the beneficiary when such right is expressly reserved in the policy."

"6727. Married woman as beneficiary—

rights. Every policy of life insurance made payable to or for the benefit of a married woman, or which after its issue is assigned, transferred, or in any way made payable to a married woman, or to any person in trust for her or for her benefit, whether procured by herself, her husband, or by any other person, and whether the assignment or transfer is made by her husband or by any other person, shall inure to her separate use and benefit, subject to the provisions of the preceding section relating to premiums paid in fraud of creditors, and subject to any indebtedness on account of the policy: Provided, that the insured under such policy shall not be denied the right to change the beneficiary where this right is expressly reserved in the policy."

Were this an action brought by creditors, it is clear that the statute would limit their rights to recover the premiums that were absolutely paid in fraud of creditors. We see no reason why more profit could be obtained by a creditor like the bank is in this case, by calling it a trust "ex maleficio," whether we class it "resulting" or "constructive." Coming to that branch of it, the lower court found that under the evidence the premiums were actually paid out of that which had been honestly acquired by the deceased.

We have examined this entire record. It was incumbent upon the plaintiff, to have any equity at all in the proceeds of the life insurance policy, to establish by a fair preponderance of the evidence that its money had been used in paying some part of the premiums. The lower court found otherwise. While it is true in this case that most of the evidence in the case was documentary, yet, in marshaling the documents, in view of its being a record of eight years of the bank, the lower court had to rely on accountants and saw the witnesses who testified, and heard the various versions of the matter, and reached the conclusions that it did. We cannot say on this evidence that we would have found different from what the lower court did.

Such being the case, the cause must be affirmed, and it is so ordered.

LESTER, C. J., CLARK, V. C. J., and McNEILL, J., concur. HEFNER and SWINDALL, JJ., concur in conclusions. ANDREWS, J., not participating. RILEY and CULLISON, JJ., absent.