## SPIRO STATE BANK v. BANKERS' NAT. LIFE INS. CO. et al.
### No. 9683.

Circuit Court of Appeals, Eighth Circuit.
Feb. 8, 1934.

James B. McDonough, of Fort Smith, Ark., and Edwin T. Watkins, of Spiro, Okl. (Sam A. Neely, of Tulsa, Okl., and Babb & Bennett, of Poteau, Okl., on the brief), for appellant.

Walter L. Pope, of Pocahontas, Ark. (Pace & Davis, of Little Rock, Ark., on the brief), for appellees.

Before STONE, SANBORN, and VAN VALKENBURGH, Circuit Judges.

SANBORN, Circuit Judge.

John McCann, of Le Flore county, Okl., on April 23, 1932, committed suicide. He had three policies of life insurance issued by the Bankers' National Life Insurance Company, each for the sum of $10,000, and each payable to his minor sons. The policies, which were five-year term policies automatically convertible into ordinary life after five years, had been written in November and December, 1928. They had been applied for and delivered in the state of Arkansas, and were therefore Arkansas contracts. The insured reserved the right to change the beneficiaries. Two of the policies from their inception were payable to the sons. One, which was originally payable to Mrs. McCann, was, on July 29, 1930, made payable to the insured's estate, and on February 16, 1931, to the sons. Upon the death of McCann $29,748.85 became due upon the policies. McCann was at that time indebted to the Spiro State Bank, of Spiro, Okl., to the extent of $17,357.98, and it made claim to so much of the proceeds of the policies as equaled his indebtedness. Thereupon the company filed a bill of interpleader in the United States District Court for the Eastern District of Arkansas against Constance L. McCann, the wife of the insured, both as an individual and as guardian for her minor sons who were the beneficiaries, the sons, the representatives of McCann's estate, and the Spiro State Bank. Mrs. McCann, as guardian, filed her answer asserting that the named beneficiaries were the only persons entitled to the proceeds of the policies and asking that the proceeds be paid to her as their guardian. The bank filed its answer claiming so much of the proceeds as would extinguish the insured's indebtedness to it. It also filed a reply to Mrs. McCann's answer, denying the right of her children to more than so much of the proceeds as exceeded the indebtness of the insured to the bank. Mrs. McCann did not file a reply to the bank's answer. From a decree in favor of Mrs. McCann, as guardian, finding that the proceeds were payable to the named beneficiaries and that the policies had not been assigned, the bank has appealed.

The question is whether the decree below was justified or whether the court should have entered a different decree.

The bank contends that, under the evidence, it was entitled to a decree in its favor, first, because Mrs. McCann, by failing to reply, had admitted the allegations of its answer; second, because, under the evidence and the law, so much of the fund as was necessary to pay the debt of McCann to it belonged to it as the holder of an equitable assignment or an equitable lien, or as the beneficiary of a constructive trust.

There is no merit to the first contention. By claiming the entire fund on behalf of her

minor sons, as the named beneficiaries, Mrs. McCann denied that any other claims against the fund existed. The bank could obtain a part of the fund only upon the strength of its own right thereto, and not because of the weakness of Mrs. McCann's right or of her pleadings. Her failure to reply could not, in any event, constitute an assignment of any part of the fund to the bank. Moreover, the issues were all voluntarily litigated, and neither the court nor the contending parties were in any doubt as to what Mrs. McCann's claims were.

██ Many of the facts are not in dispute. When the policies were written, the insured was fifty-two years old, his wife thirty-five, one of his sons eleven, and the other nine. For some fourteen years he had been a customer of the bank. Terrell, its president, was a man of about the same age as the insured, and was intimately acquainted with his affairs and his assets. The insured was engaged in farming some 2,000 acres of land near Spiro. In order to finance his operations, he borrowed money from the bank and kept his account at the bank. The bank could loan him only $4,500 upon his own note, but it made a practice of letting him have additional funds upon the notes of his tenants indorsed by him. At the end of the year he was ordinarily required to take up the paper of his tenants and to renew his own note. In 1927, due to adverse conditions, he began to fall a little behind. In December, 1928, he owed the bank $6,000, $4,500 being upon his own note and the balance represented by the notes of his tenants which he had indorsed. He wanted all of this indebtedness carried over, and that was done. At the end of 1929 a financial statement which he gave the bank showed total assets of $229,100, of which $192,000 was real estate. It showed liabilities of $42,500, of which $6,000 was owed to the Spiro Bank and $4,500 to another bank, and $32,000, the incumbrance upon his real estate. His net worth was stated to be $176,500, but a correct computation of the various items in the statement shows it to have been $186,600. His life insurance—not listed as either an asset or a liability—was stated to be $60,000. In November, 1930, he gave to Dr. Holt, his brother-in-law, a mortgage for $10,000 upon his chattels, which had previously been unincumbered. He also gave a mortgage for $25,000 upon his real estate to Mrs. Holt, and there was filed for record about the same time a $5,000 mortgage on part of his real estate, which mortgage had been given to Mrs. Holt in 1927. In January, 1931, the bank reduced

its claim to judgment. The record is silent as to what loans were made by the bank to McCann after 1928, but there is testimony that his indebtedness became "heavier and heavier." It is a fair inference that the bank loaned him no money after November, 1930. Dr. Holt financed McCann's crop in 1931, paid the premiums upon the policies in January, 1932, and was prepared to finance the 1932 crop, but the bank "advertised and sold his (McCann's) farm," and he had no place for a crop.

McCann's dealings at the bank had been with Terrell, the president, and Conn, the cashier. The substance of Terrell's testimony relative to the insurance is this: In June, 1928, McCann talked with Terrell about his indebtedness and said that if he lived a few years he could take care of it, and asked Terrell what the cheapest insurance was, and decided on term insurance. He said he would like to do everything to protect the bank, but, in case something should happen to him and he could not meet the premiums, he would lose the insurance. Terrell then told him that, if he would take the insurance so the bank would be protected, it would carry over that year's indebtedness and increase his credit with the bank enough to take care of the premiums at all times. There never was a time when McCann discussed the insurance with Terrell that he did not say it was for the protection of the bank. He said all the time that he had this insurance made payable to his estate for the protection of the bank. In June, 1929, he told Terrell that the bank was protected by insurance. In November or December, 1930, Terrell asked him for security, and he told him he had none, but said: "I feel like you are protected in case I die you are protected, and in case I live you know I will be able to pay you. I will pay you every dollar I owe you." He told Terrell he had "covered up" everything, including insurance; "so we (the Bank) couldn't sell it, and we would have to carry it." Terrell did not know what companies insured McCann nor the terms of his policies, nor when the premiums were due, nor when they were paid, nor who paid them after 1931. Terrell never asked for an assignment of the insurance or for the possession of the policies, and no record of the bank shows any assignment or pledge of the policies or that the bank had any interest in them whatever.

Mr. Conn, the cashier of the bank, testified that he heard McCann talk of insurance on one occasion in the fall of 1930, that this was when security was being asked for, and

that McCann remarked that he had taken out the $60,000 of insurance for the bank's protection and that of his other creditors. Both Conn and Terrell testified that the bank paid the premiums, but admitted that what they meant was that the bank had loaned McCann money which he deposited with other moneys in his checking account and that the premiums were paid by check in the same manner as McCann paid all his other bills.

After the bank had procured its judgment against McCann in 1931 and after an execution had been returned unsatisfied, McCann was examined under oath in proceedings supplementary to execution. The record shows that he testified relative to a conversation with Terrell and Conn, which was evidently the conversation which they testified took place in the fall of 1930. McCann said: "I told them I had my insurance, that I took it with the express purpose of protecting them, which I did, with my other creditors, and I told them I was going to pay them every cent I owed them. I had never failed in my life to meet every obligation I had and I intended to pay this one and pay them every dollar I owed them."

The bank argues that the testimony of Terrell and Conn and the admissions of McCann show that this insurance was taken out by McCann for the protection of the bank; that the designation of his sons as beneficiaries was fraudulent; that premiums were paid out of funds furnished by the bank; and that the bank therefore created the fund which came into existence upon McCann's death, and is in equity entitled to payment of its indebtedness out of this fund. But the testimony upon which the bank relies negatives any intention on the part of McCann to assign the policies to the bank and indicates only an understanding, agreement, or representation that the policies would be made payable to McCann's estate for the benefit of all his creditors. Furthermore, the improbability, unreasonableness, and unsatisfactory character of the testimony of Terrell and Conn prevents our reliance upon it. It is unreasonable that a bank to which an insured was indebted to the extent of $6,000, and which could properly loan him only $4,500, would insist that he carry $60,000 of term insurance payable to his estate for the benefit of all his creditors, as a condition for the renewal of his indebtedness and the making of future loans. Such insurance during the lifetime of the insured is a liability and not an asset. The premiums pay merely for protection and create no surrender values. If the bank had made it a condition that Mc-Cann carry life insurance for its protection, the reasonable thing to have done was to have him make a sufficient amount of his insurance payable to the bank or to require that he assign it to the bank as security for his loans. At the very least, if any such agreement had existed as the bank claims, the bank would have required that the policies be delivered to it, so that it might see that the premiums were paid when due and its rights protected against assignments and changes of beneficiaries. The truth, we think, is obvious. There was no such agreement as is claimed. There was, no doubt, some talk about insurance, which, now that McCann is dead, takes on a new aspect, but the bank in no way relied upon McCann's insurance during his lifetime as security, because it did not expect him to die, and the insurance had no value unless he died. If the bank had taken over his insurance—which it at no time made an attempt to do—it would almost certainly have been faced with the necessity of paying premiums, with only the remote possibility of being able to collect anything on the policies.

The fact that the testimony of Terrell and Conn is uncontradicted does not require a finding that it is true. F. T. Dooley Lumber Co. v. United States (C. C. A. 8) 63 F.(2d) 384, 388.

We think the evidence shows nothing more than an unexecuted purpose of McCann, when he took out the policies, to protect his creditors, which did not constitute an agreement with any one, and was not relied upon by any one.

The court below was entirely justified in finding that there was no assignment of these policies to the bank. It could not have found otherwise.

■ It is contended that, when McCann took out these policies, he was insolvent, and that his creating of this estate by applying funds, which should have gone to his creditors, in payment of premiums, was a fraud, and that this gives the bank a right to the payment of McCann's indebtedness to it from the proceeds of his policies.

The evidence does not justify a conclusion that McCann was insolvent when he took out these policies. The bank itself, in its answer, says: "This defendant further states that the financial condition of said John McCann at that time was such that but for said agreement, upon which this defendant relied, this defendant could have compelled said John McCann at that time to pay all his indebtedness to this defendant."

Neither is there testimony indicating any actual fraud. The bank's claim of fraud is based upon the proposition that McCann, at the time he took out these policies, did so in violation of his agreement with and his representation to the bank that they were for its protection in the advancing of moneys to him. Since the evidence establishes no such agreement or representation upon which the bank relied, it was not fraudulent for McCann to make these policies payable to his minor sons either initially or subsequently, unless it be found from the evidence that he used funds for the payment of premiums which equitably belonged to his creditors. But the right of even an insolvent debtor to make reasonable provision for the future of those dependent upon him is recognized by the courts. Such a debtor is faced with a conflict between two obligations, one, to provide for his family, and, the other, to refrain from the use of assets for himself and his family which he should use for the payment of his debts. One cannot justly be charged with fraud who makes reasonable provision for the future of his minor children by carrying life insurance.

In Central Nat. Bank of Washington v. Hume, 128 U. S. 195, 211, 9 S. Ct. 41, 46, 32 L. Ed. 370, it is said by the Supreme Court of the United States: "This argument in the interest of creditors concedes that the debtor may rightfully preserve his family from suffering and want. It seems to us that the same public policy which justifies this, and recognizes the support of wife and children as a positive obligation in law as well as morals, should be extended to protect them from destitution after the debtor's death, by permitting him, not to accumulate a fund as a permanent provision, but to devote a moderate portion of his earnings to keep on foot a security for support already, or which could thereby be, lawfully obtained, at least to the extent of requiring that, under such circumstances, the fraudulent intent of both parties to the transaction should be made out."

In Ross v. Minnesota Mutual Life Ins. Co., 154 Minn. 186, 191 N. W. 428, 429, 31 A. L. R. 46, the court said: "One of the highest duties of a husband and father is to provide for his family during his life, and to make provision for it after his death. To this end he may devote a moderate portion of his earnings to insure his life, in favor of his wife, and so make reasonable provision for the future, without thereby being held to have intended to defraud his creditors, even

though he was insolvent when he effected the insurance or paid the premiums."

In Pence v. Makepeace, 65 Ind. 345, 359, the court said: "The procurement of a policy of life insurance, as a provision for the family of the assured in the event of his death, and the payment of premiums thereon, by a person insolvent or of limited means, whose wife and family may be dependent upon him and his labor for the comforts and even the necessaries of life, are acts to be fostered and encouraged by the law. For these acts are not hostile to, but we think are in full accordance with, those provisions of our law, which bear upon the rights and duties incident to the family relation. Society can not be benefited by the abject poverty or destitution of any family; but, on the contrary, its welfare or well-being is largely dependent upon the welfare or well-being of each and every family. A necessary provision for his own household is a duty enjoined upon every man, by divine as well as human law. * * *"

In American Nat. Bank of Okmulgee v. King et al., 158 Okl. 278, 13 P.(2d) 164, a bank was attempting to recover proceeds of life policies carried by its defaulting president which were payable to his widow and children. It appeared from the evidence that virtually all of the premiums had been paid while he was in default to the bank, and that at the time he committed suicide he was indebted to the bank in the sum of about $221,000. The court said (page 167 of 13 P.(2d): "The insured was a married man. He was the father of two minor children. He had provided a contract of insurance on his life for their benefit. In order to mature that contract and make it of any appreciable value, death must ensue. In his dilemma, he sacrificed his life. As a result of that sacrifice the company became liable. We think that the interest the wife and children had in the matter far outweighed what the bank had invested, if it should be established that the bank's money paid the premiums in their entirety."

In this case, while fraud is alleged in the bank's answer and argued in its brief, there is nothing in the evidence which indicates to us that McCann, when he took out this insurance or when he paid the premiums on it, or made a change in the beneficiaries, had any thought in mind of hindering, delaying, or defrauding his creditors or of impairing his ability to pay them by using his funds to create an estate for his children. To what extent, if any, his ability to pay was impaired

by his carrying insurance is a matter of conjecture. The evidence shows that, after the premiums upon these policies became due in December, 1931, and just before the grace period expired in January, 1932, Dr. Holt, the brother-in-law of the insured, paid the premiums for him. Had it not been for that payment, the policies would have lapsed, and no fund would ever have come into existence. It was this payment by Dr. Holt and the suicide of McCann which brought into existence the fund which the bank is seeking to reach.

 Under the laws of Oklahoma at the time of McCann's death, the payment of premiums by an insured when insolvent gave to his creditors no right to the proceeds of his policies, as against the named beneficiary, beyond the amount of any premiums paid by the insured in fraud of his creditors. Section 6726, C. O. S. 1921, § 10517, Okl. St. 1931; American Nat. Bank of Okmulgee v. King et al., supra, 158 Okl. 278, 13 P.(2d) 164. Under the laws of Arkansas at that time, the rights of creditors to the proceeds of a policy, where premiums had been paid in fraud of creditors, were the same as in Oklahoma. Act No. 76, p. 214, of the General Assembly of Arkansas 1931. The bank argues that, since the Arkansas act was passed after these policies were issued and after premiums were paid in fraud of creditors, it cannot apply to the proceeds of these policies. A similar contention was made in Kittel v. Domeyer et al., 175 N. Y. 205, 67 N. E. 433. The court held that such a statute did apply to policies issued prior to its enactment. It was said (page 435 of 67 N. E.): "The statute is enabling, and relates to the remedy. Baron v. Brummer, 100 N. Y. 372, 3 N. E. 474. The right of the state is clear to change and to regulate the exemption before the insurance fund which the husband accumulates during his life reaches the wife."

Compare Gwinn v. Commissioner of Internal Revenue, 287 U. S. 224, 228, 229, 53 S. Ct. 157, 77 L. Ed. 270.

No rights to the fund which came into existence on the death of McCann had vested during his lifetime, not even the rights of the beneficiaries. Supreme Council of Royal Arcanum v. Behrend, 247 U. S. 394, 38 S. Ct. 522, 62 L. Ed. 1182, 1 A. L. R. 966; Royal Union Mut. Life Ins. Co. v. Lloyd (C. C. A. 8) 254 F. 407, 411. And the situation here is not comparable to that in Navassa Guano Co. v. Cockfield et al. (C. C. A. 4) 253 F. 883, 6 A. L. R. 1168. If the passage of Act No. 76 changed the law in Arkansas with respect to the rights of the creditors of the insured, which is doubtful, it limited their remedy to the recovery of an amount, from the proceeds of his policies, equal to such premiums as had been wrongfully diverted by him from funds which should have been paid upon his debts. Since, in our opinion, neither the laws of Oklahoma nor those of Arkansas permit the bank to have recourse to the proceeds of the insurance for the payment of the debt of the insured to it, it is unnecessary to decide whether the rights of the parties are affected by the laws of the state where the contract was made or the laws of the state where the parties and the insured lived, where the policies had their situs and where the debts were incurred, although we see no reason why in an interpleader action brought in Arkansas the rights of the beneficiaries should be any different than they would be had the action been instituted in Oklahoma, in which case it seems probable that the laws of Oklahoma might have been applicable, since that was the domicile of all concerned and was apparently the state in which the contract was performable. See Scudder v. Union National Bank, 91 U. S. 406, 23 L. Ed. 245; London Assurance v. Companhia De Moagens Do Barreiro, 167 U. S. 149, 160, 161, 17 S. Ct. 785, 42 L. Ed. 113; Union Trust Co. v. Grosman, 245 U. S. 412, 38 S. Ct. 147, 62 L. Ed. 368.

That a creditor may not have the proceeds of life policies under circumstances fairly analogous to those involved in the case before us was held in Harriman National Bank v. Huiet (C. C. A. 4) 249 F. 856. See, also, Ætna National Bank v. Manhattan Life Ins. Co. (C. C.) 24 F. 769; Ross v. Minnesota Mutual Life Ins. Co. supra, 154 Minn. 186, 191 N. W. 428, 31 A. L. R. 46; American National Bank of Okmulgee v. King, supra, 158 Okl. 278, 13 P.(2d) 164; Little v. Berry (Ky.) 113 S. W. 902.

 Since, in our opinion, the proof failed to show an assignment of these policies to the bank or an agreement that they were pledged to the bank as security for loans, or that the insured was insolvent when they were issued to him, or that he was guilty of any actual fraud, or what premiums, if any, were paid in fraud of his creditors, our conclusion is that the court below correctly disposed of the case in awarding the entire proceeds of the policies to Mrs. McCann, as guardian for the beneficiaries.

The decree is affirmed.