PENN MUT. LIFE INS. CO. OF PHILA-
DELPHIA, PA., v. MILLER et al.
(two cases).

NORTHWESTERN NAT. LIFE INS. CO. v.
UNION AVE. BANK OF COMMERCE
et al.

NORTHWESTERN MUT. LIFE INS. CO. v.
MILLER et al.

Nos. 69, 70, 76, 81.

District Court, W. D. Missouri, W. D.

Feb. 26, 1940.

Fisher, Whitten & Keyes, of Kansas City, Mo., for plaintiff Penn Mut. Life Ins. Co. of Philadelphia.

O. H. Swearingen, of Kansas City, Mo., for defendant Minnie M. Miller.

Barnett, Seddon & James, of Kansas City, Mo., for defendant Harold O'Brien.

Frederick E. Whitten (of Fisher, Whitten & Keyes), all of Kansas City, Mo., for plaintiff Penn Mut. Life Ins. Co.

Harry B. Jenkins, and Chet D. Vance, both of Kansas City, Mo., for defendant Rose S. Miller.

Michaels, Blackmar, Newkirk, Eager & Swanson, of Kansas City, Mo., for plaintiff Northwestern Nat. Life Ins. Co.

James E. Goodrich, of Kansas City, Mo., for defendant Union Ave. Bank of Commerce.

Winger, Reeder & Barker, of Kansas City, Mo., for plaintiff Northwestern Mut. Life Ins. Co.

Harry B. Jenkins and Chet D. Vance, both of Kansas City, Mo., for defendants Suzanne Miller and Louise Miller.

REEVES, District Judge.

With slight and immaterial variations, the same facts apply in each of the above cases.

The question involved is whether the defendant Harold O'Brien, as an assignee, is entitled to collect the proceeds of four different insurance policies issued on the life of Richard G. Miller and wherein other defendants are named as beneficiaries.

It is the contention of the said O'Brien that the premium payments on such insurance were made out of funds wrongfully and fraudulently obtained by the assured, and that therefore he became and was a trustee ex maleficio for the benefit of the bank (O'Brien's assignor), from which the funds, as it is alleged, were so fraudulently obtained.

There were no controversial or disputed facts.

The defendant Harold O'Brien is the assignee of the Union Avenue Bank of Commerce of Kansas City, Missouri. Such assignment was made by said bank in the fall of 1938 and covered all of the delinquencies and irregularities in said bank occasioned by the acts of its bookkeeper, Fred W. Tesch. The consideration for such assignment was the payment by the said O'Brien of the sum of $25,863.82, as a representative of, or agent for Lloyd's of London.

While such irregularities were being perpetrated, the said Lloyd's of London carried a fidelity bond on said bookkeeper, among other employees, and agreed to hold said bank harmless and to indemnify it in case of loss by reason of failure in fidelity of the employees, or any of them.

Upon payment of the indemnity to the bank and the assignment of all rights inhering in it to the said O'Brien, demand was then made by him upon the several insurance companies for payment to him of the benefits promised in said several policies on the life of Miller. The policies had matured by reason of the death of Miller.

Similar demands upon the plaintiffs were made by the beneficiaries and thereupon the said several plaintiffs instituted these proceedings under the statute governing interpleaders, and they pray for a determination as to the proper or rightful party or parties to which or to whom the funds should be distributed or paid.

The irregularities began on December 12, 1935, or thereabouts. At that time the said Fred W. Tesch was the sole bookkeeper of the bank, and such relation continued through all the time covered by these suits.

The insured, Richard G. Miller, owned and operated a cafe or cafeteria in the immediate vicinity of the bank. He was a patron or customer of said bank. His account was not a desirable one, and permission to overdraw had been expressly refused. Moreover, the said Tesch had been specially instructed not to permit the said Miller to overdraw his account in the bank. Notwithstanding such instructions to the bookkeeper and the express refusal by the officers of the bank, on December 12, 1935, Miller issued a check for which his funds in the bank were insufficient. The bookkeeper did not report or return the check as was his plain duty, but, on the contrary, advised Miller that his account lacked funds to meet the draft or check. Then Miller asked Tesch to hold the check, conceal the fact from the officers, and said that on the next day he would make the check good. The bookkeeper granted the request. Instead of covering or meeting the check the next day as promised, other checks followed which also exceeded his bank ledger credit. The bookkeeper in the meantime continued to rely upon the promises of Miller to make good his overdrafts, and, as an expedient and for the purpose of covering up and concealing the facts, charged many of the checks to accounts of other customers. Others he carried as cash items, but in a way that enabled him to conceal the facts from the officials of the bank.

An examination of the bank in the summer of 1938 revealed the irregularities, and, thereupon, Tesch frankly disclosed the facts and produced nearly all of the checks involved in the overdrafts. The overdrafts, as stated, exceeded $25,000, and the exact amount was paid under the fidelity bond by O'Brien for his principal.

208

The checks issued by Miller in excess of his ledger credit were used largely to pay bills incurred in the operation of his cafe or cafeteria and also bills accruing in the construction of a residence. A few of the checks were used in payment of premiums falling due on his insurance policies. Other premiums, however, were paid in cash, or paid out of his account on occasions when the payment did not create an overdraft or exceed the ledger credit.

During the entire time Miller's account was not shown to have been overdrawn except in an immaterial and unimportant detail. He continued to make deposits and his account was adequate to cover many drafts made upon it; but, as stated, it was insufficient by more than $25,000 to meet all of the checks issued by him during the period.

While such irregularities were going on, Miller continued to urge secrecy and concealment from the officials of the bank, and, at the same time, he made fair promises to Tesch to reimburse the bank for all the checks honored and paid by it. In his testimony, the bookkeeper said that he relied on the promises of Miller to make good the first checks, and, thereafter, he feared to make disclosures lest it might imperil his position. When the magnitude of the irregularities was revealed in 1938 both Tesch and Miller were arrested, and while the said Miller was confined in jail he died by his own hands.

Upon a trial to a jury on the question of his sanity, in some of the cases a verdict was returned that he was insane when he took his own life. By reason thereof certain accident and double indemnity provisions of some of the contracts add materially to the benefits.

■ 1. It is important at the outset to consider the exact relationship of the assured to the assignor bank. He was a depositor in the bank and was permitted to maintain an active checking account. Under all of the authorities the relation of debtor and creditor existed between him and the bank. If the bank had authorized or permitted overdrafts by him, then, in such case, the relationship would have been the same as if the bank had purchased said checks as negotiable paper issued by the said Miller. Miller was not therefore in any confidential or fiduciary relationship to the bank. The witness Tesch was.

■ The question is posed, however, whether Miller, by his conduct, after issuing excessive checks, in persuading the bookkeeper to conceal the fact, became by operation of law a fiduciary for the bank. In 65 C.J. § 230, p. 487, the rule is laid down with respect to confidential and fiduciary relations extending to third persons as follows: "A confidential relation existing between two persons ordinarily does not extend to a third person, dealing with one of them, and as to whom the latter occupies a different relation, so as to form the basis of a constructive trust between such third person and the other fiduciary."

2. Recovery by the defendant Harold O'Brien in this case can be warranted only upon the doctrine of a constructive trust in favor of his assignor, the bank.

■ Wrongfully acquired possession or control of property will form the basis for a constructive trust. Such trusts are created where the possession or control of property is obtained by mistake, or by means of deception or with bad faith. It is upon the latter that counsel assert the right of recovery by the assignee in this case.

The broad doctrine of constructive trusts is accurately defined in 65 C.J. § 215, p. 456, as follows: " * * * as a general principle, a constructive trust will arise whenever the circumstances under which property was acquired make it inequitable that it should be retained by him who holds the legal title, as against another, provided some confidential relation exists between the two, and provided the raising of a trust is necessary to prevent a failure of justice. So, as has been said, the forms and varieties of constructive trusts are practically without limit, such trusts being raised, broadly speaking, whenever necessary to prevent injustice."

At all times, according to the testimony, Miller did not dispute his obligations to the bank. On the contrary, he repeatedly promised to provide adequate funds to meet all of his checks. While the irregularities were being committed by the bookkeeper, the checks of Miller were held by Tesch.

3. The case mainly relied upon by counsel for the assignee is that of Vorlander et al. v. Keyes, 8 Cir., 1 F.2d 67, 68. The assured in that case was Christian Vorlander. He was president of the First National Bank of Eureka, S. D. He obtained insurance wherein his wife and children were named as beneficiaries and paid some of the premiums out of his own funds or property. Several of the premiums, how-

ever, he paid, "with the funds of the bank, which he secretly misappropriated to that purpose."

In deciding the case, 1 F.2d loc. cit. 69, the Court of Appeals announced this doctrine: "One who, acting in a fiduciary capacity, secretly and wrongfully, and therefore fraudulently, uses fiduciary funds to purchase real estate or personal property, including policies of life insurance, for his own benefit and puts it in his own name, takes the title and interest in it as a trustee ex maleficio for the owner of the misappropriated funds he thus uses, the cestui que trust."

In the opinion, the late Walter H. Sanborn of the Circuit Court of Appeals discussed and analyzed a line of cases denying recovery under certain circumstances and also a line of cases permitting recovery under named circumstances. In doing so, he cited the case of Bank of Stewart County v. Mardre, Administratrix, et al., 142 Ga. 110, 82 S.E. 519. That was a case, said Judge Sanborn, where "the transaction evidenced no trust, but the ordinary relation of debtor and creditor between the assured, who paid the premiums, and the bank, upon which he drew the check."

In commenting upon the Georgia case, Judge Sanborn said: "The opinion in that case leaves no doubt that the court never considered or decided the question whether, in case there had been a trust, the measure of the recovery of the cestui que trust would be a part of or all the proceeds of the insurance, or the amount paid on account of the premiums."

The instant case is more nearly in the line of cases where recovery was denied. In each of the cases relied upon by Judge Sanborn in the Vorlander case, a fiduciary relationship existed in fact, and not constructively. The Vorlander case was decided on September 8, 1924. Judge Robert E. Lewis, now of the Tenth Circuit Court of Appeals, sat with Judge Sanborn in that case.

On the 14th of August, 1926, Judge Lewis wrote the opinion in the case of Sweet v. Lang, 8 Cir., 14 F.2d 762, loc. cit. 768. He specially differentiated the facts in the Vorlander case from the facts before him in the Sweet case. Judge Lewis said: "We think our opinion in Vorlander v. Keyes [8 Cir.], 1 F.(2d) 67, relied on by appellant, has no application here. Vorlander, an officer of the bank and in charge of it, took its funds without the permission or consent of any one by himself and used them in the purchase of insurance policies on his own life. He in effect embezzled the bank's funds and used them as a trustee ex maleficio."

In the Sweet case the suit was brought by the receiver of a bank to recover premiums paid on a policy of insurance on the life of one Alvin H. Poehler, a director of the bank. The premiums were paid out of the bank's funds and it was argued that the doctrine of the Vorlander case would apply. The court's decision was based on a syllabus in the case of Little v. Garabrant, 90 Hun 404, 35 N.Y.S. 689, as follows: "'All the stockholders of a corporation having assented to the use of corporate funds for the payment of premiums on a policy on the life of one of its stockholders, payable to his wife, another stockholder, and the payments having been made while the corporation was solvent, its receiver cannot, because of such diversion of funds, maintain an action to have the policy declared his property.'"

The Sweet case is very similar to the facts here: One Alvin H. Poehler, as president of the corporation, "had wrongfully and without authority paid off his personal indebtedness to each defendant by giving the corporation's check or checks"; and, it was contended, "that each defendant knew the facts and should be held to have received the moneys of the corporation for its use and benefit, and is thus liable to the receiver as for money had and received." The court ruled the case against the receiver, because, as it said, "Its officers, directors, and stockholders approved, authorized, and ratified by long course of dealing all of the transactions of which the receiver now complains."

The difference here is that the officers of the bank did not know of the irregularities being permitted or perpetrated by their bookkeeper, nor did the plaintiffs or beneficiaries know the facts.

A case somewhat illuminating is that of Harriman Nat. Bank v. Huiet et al., 4 Cir., 249 F. 856. The second syllabus is particularly apt here. It is as follows: "That a husband obtained money by fraudulent representations with which to pay premiums on life insurance policies payable to his wife does not render the proceeds of such policies subject to the claims of his creditors, where they are exempted by statute and the wife was not a party to the fraud."

210

This case is mentioned for the reason that, regardless of legislative exemptions, it was stated by the court that the money to pay the premiums was obtained by false and fraudulent representations.

█ It should be kept in mind that Tesch was an employee of the bank; that the assignee is not in a superior or better position than the bank, and, that, since the bank's employee in part caused the trouble, it cannot be said that its equity is greater or superior to that of the beneficiaries who have substantial rights, and who are innocent of any wrong-doing.

4. Another important question relates to the rights of the named beneficiaries, the other defendants.

In Jones v. Van Doren, 130 U.S. 684, loc. cit. 691, 9 S.Ct. 685, 687, 32 L.Ed. 1077, the Supreme Court said: "One who by fraudulent misrepresentations obtains a conveyance from the owner of any interest in property, real or personal, is in equity a trustee ex maleficio for the person defrauded, and any one taking the property from such trustee with notice of the fraud and of the consequent trust is affected by the trust."

In this case there is no evidence that the beneficiaries are other than innocent parties.

In the case of Spiro State Bank v. Bankers Nat. Life Ins. Co. et al., 69 F.2d 185, 189, the Court of Appeals, this Circuit, denied recovery where it was contended that the insured paid premiums on his policies while insolvent, and at a time when he had assured a bank creditor that the policies were being carried for the protection of his creditors. His wife and children, however, were named as beneficiaries. In denying the right of the creditors to take the proceeds of the policies after the suicide of the assured, the court cited with approval the case of American National Bank of Okmulgee v. King et al., 158 Okl. 278, 13 P.2d 164. In that case, a bank was attempting to recover the proceeds of life insurance policies carried by its defaulting president. The widow and children were named as beneficiaries, and the court said: "It appeared from the evidence that virtually all of the premiums had been paid while he was in default to the bank, and that at the time he committed suicide he was indebted to the bank in the sum of about $221,000. The court said ([153 Okl. 278], page 167 of 13 P.(2d):

'The insured was a married man. He was the father of two minor children. He had provided a contract of insurance on his life for their benefit. In order to mature that contract and make it of any appreciable value, death must ensue. In his dilemma, he sacrificed his life. As a result of that sacrifice the company became liable. We think that the interest the wife and children had in the matter far outweighed what the bank had invested, if it should be established that the bank's money paid the premiums in their entirety.' "

The Oklahoma case was far stronger on its facts in favor of the bank than the case at bar. The Court of Appeals further said in the Spiro State Bank case, 69 F.2d loc. cit. 189: "In this case, while fraud is alleged in the bank's answer and argued in its brief, there is nothing in the evidence which indicates to us that McCann, when he took out this insurance or when he paid the premiums on it, or made a change in the beneficiaries, had any thought in mind of hindering, delaying, or defrauding his creditors or of impairing his ability to pay them by using his funds to create an estate for his children. To what extent, if any, his ability to pay was impaired by his carrying insurance is a matter of conjecture."

Similarly in this case, it did not appear from the evidence that when the insured, Miller, paid the premiums it was with any idea or thought of defrauding the bank or any of his creditors. In fact, there was no direct evidence of his insolvency, but, be that as it may, all of the evidence tends to show that the insured sought an indulgence from the bookkeeper which he knew he could not obtain from the officials of the bank, and that the bookkeeper permitted a privilege over the express adverse instructions of the officials of the bank.

The fact that Miller was operating an old and established business, and one that had been in his family for a long time, and the fact that he was engaged in building a residence or a home, all tend to negative an intention on his part to defraud the bank or permanently deprive it of its funds.

█ While the doctrine might have been urged and considered in the Vorlander case, yet nevertheless it is the general rule that a beneficiary under an ordinary life policy takes a vested interest at the moment the policy is executed and delivered. Lloyd v. Royal Union Mut. Life Ins. Co., D.C., 245 F. 162.

And, a distinction is made by the courts between those cases where the insurance is taken out in favor of the beneficiary and those cases where the insured takes such insurance in his own behalf and then assigns it. Such distinction was made by the Supreme Court in Washington Central Nat. Bank v. Hume, 128 U.S. 195, loc. cit. 207, 9 S.Ct. 41, 45, 32 L.Ed. 370. Note the language: "The obvious distinction between the transfer of a policy taken out by a person upon his insurable interest in his own life, and payable to himself or his legal representatives, and the obtaining of a policy by a person upon the insurable interest of his wife and children, and payable to them, has been repeatedly recognized by the courts."

The court cited with approval the case of McCutcheon's Appeal, 99 Pa. 133, loc. cit. 137: " 'Here, however, the policy was effected in the name of the wife, and in point of fact was given under an agreement for the surrender of a previous policy for the same amount, also issued in the wife's name. * * * The question of good faith or fraud only arises in the latter case; that is, when the title of the beneficiary arises by assignment. When it exists by force of an original issue in the name or for the benefit of the beneficiary, the title is good, notwithstanding the claims of creditors. * * * There is no anomaly in this, nor any conflict with the letter or spirit of the statute of Elizabeth, because in such cases the policy would be at no time the property of the assured, and hence no question of fraud in its transfer could arise as to his creditors. It is only in the case of the assignment of a policy that once belonged to the assured that the question of fraud can arise under this act.' "

Further considering the rights of the beneficiary, the court said, 128 U.S. loc. cit. 209, 9 S.Ct. loc. cit. 45, 32 L.Ed. 370: "* * * as Mrs. Hume and the children survived him, and the contracts covered their insurable interest, it is difficult to see upon what ground the creditors, or the administrators as representing them, can take away from these dependent ones that which was expressly secured to them in the event of the death of their natural supporter. The interest insured was neither the debtor's nor his creditors'. The contracts were not payable to the debtor, or his representatives, or his creditors. No fraud on the part of the wife, or the children, or the insurance company is pretended. In no sense was there any gift or transfer of the debtor's property, unless the amounts paid as premiums are to be held to constitute such gift or transfer."

Moreover, the court in the same case indicated a public policy in favor of beneficiaries under circumstances similar to this. Note the language, 128 U.S. loc. cit. 211, 9 S.Ct. loc.cit. 46, 32 L.Ed. 370: "This argument in the interest of creditors concedes that the debtor may rightfully preserve his family from suffering and want. It seems to us that the same public policy which justifies this, and recognizes the support of wife and children as a positive obligation in law as well as morals, should be extended to protect them from destitution after the debtor's death, by permitting him, not to accumulate a fund as a permanent provision, but to devote a moderate portion of his earnings to keep on foot a security for support already, or which could thereby be, lawfully obtained, at least to the extent of requiring that, under such circumstances, the fraudulent intent of both parties to the transaction should be made out."

5. In all of the discussions the doctrine invoked has been upon the assumption that the insured actually came into possession of the money paid out by the bank. Such was not the fact. In each instance Miller issued checks which were merely orders upon the bank to pay somebody else. He did not, as in the Vorlander case and others of a similar nature, take money into his custody and appropriate it to his own use.

If Tesch, the employee of the bank, had appropriated the money to his own use and to pay premiums on policies on his life, as in the Vorlander case, the situation would have been far different, although there is a line of cases, such as the Oklahoma case heretofore mentioned, and such as Doyle v. Murphy, 22 Ill. 502, 74 Am. Dec. 165, where recovery was denied, even though clearly within the ambit of the fiduciary relation doctrine.

A careful examination of the authorities shows that the doctrine of the Vorlander case is limited to those cases where the proceeds of the policies could be reached by creditors only where the premiums were paid with stolen or embezzled funds (37 C.J. § 355, p. 589), and where a fiduciary or confidential relationship actually existed. Even then the authorities are not uniform or harmonious.

In the case of the mother of the assured, and named as the beneficiary in one of·the policies, there was evidence she had advanced a considerable sum of money to her son under a promise that he would protect such advancement with insurance. This evidence, while before the court as an offer of proof, was excluded. It should have been admitted, as it was competent evidence to show a special interest of the mother in the life of the assured, although without it she is entitled to recover.

In view of the foregoing, the defendant Harold O'Brien is not entitled to recover, and decrees should be entered in favor of the defendants as beneficiaries. Such decrees should include the special benefits promised in some of the policies in case of death by accident. It having been found that the assured was insane when he took his own life, his death was, in law, an accident.