[Sac. No. 5280. In Bank.—August 24, 1940.]

FRED H. TRETHEWAY, as Executor, etc., Respondent, v. HARRY B. TRETHEWAY, Appellant.

O. C. Parkinson for Appellant.

Louttit, Marceau & Louttit for Respondent.

CARTER, J.—This appeal questions the correctness of that portion of the judgment of the trial court which requires defendant to account for the sum of $13,431.49, obtained by undue influence from his aged mother over the period of eleven years prior to her decease.

The facts forming the background of the litigation are set forth in *Estate of Tretheway*, 32 Cal. App. (2d) 287 [89 Pac. (2d) 679]. George P. Tretheway died in 1925. He was survived by his wife, Mary A. Tretheway, and four children, George, Fred, Harry, and Emma. Upon probate of his will, his estate, consisting of one-half of the community property, was distributed in trust to his widow, to the son, George, and to attorney H. Nelson French, as trustees. The other half of the community property went to the widow in absolute ownership. The terms of the trust were that the widow should have the income from the trust estate, together with as much of the principal, not exceeding $2,000 a year, as she should find necessary for her support, and that upon her death the remainder of principal should pass to the four children and certain grandchildren.

No segregation was ever made between the half of the property which passed subject to the trust and the remaining half which was distributed to the widow without restriction.

Attorney French declined to act as trustee, and after about two years the son, George, also practically ceased to act. This left the widow as the only active trustee, and she dealt with the trust estate and her own property as a unit.

Over the entire period from the death of her husband in 1925, to her own death in 1936, she carried on her business transactions, including those of the trust, largely through her son, Harry, the defendant herein. Harry had been residing with his parents in Stockton at the time of the father's death and thereafter he continued to reside with his mother. In the fall of 1928, the two had a disagreement, and the mother went to live with the daughter, Emma, in Berkeley, but after a few months she returned to Stockton, and at her request Harry resumed his residence with her. She passed away on April 6, 1936, at the age of about 83 years, and Harry and another son, Fred, were made executors of her will.

Harry, as executor, filed an account on behalf of decedent as trustee under her husband's will, but in this he was not joined by either George, as cotrustee, or Fred, as coexecutor. The account, as finally affirmed (*Estate of Tretheway, supra*), showed that decedent had consumed principal assets of the trust estate at the rate of almost $2,000 a year, which was the maximum permitted by the terms of the trust.

On June 28, 1937, Fred, as executor, filed the present action against Harry, his coexecutor, charging that Harry had taken advantage of his mother's weakened mental condition and of his influence over her, to induce her to turn over various properties and moneys to him, which assets he had converted to his own use, in violation of his relation to her of confidence and trust. The prayer of the complaint was that such assets be impressed with a trust, and that Harry be required to account for them, and to return them to the mother's estate. During pendency of the cause Harry was suspended as executor.

A prolonged trial resulted in the entry of findings and judgment in favor of plaintiff, impressing a trust upon certain property and, among other things, requiring defendant to account to plaintiff for the sum of $13,431.49. Although defendant gave notice of appeal from the entire judgment, both as originally entered and as modified on motion for new trial, his attack is confined to the $13,431.49 item of accounting, and the bill of exceptions contains only the evidence

bearing upon that issue. As to all other issues, it is conceded that there was evidence sufficient to support the findings and that they are therefore conclusive.

Among the findings to which no exception is taken are the following: Between May 9, 1925 (date of death of George P. Tretheway), and April 26, 1934, Mary A. Tretheway was in a weakened condition both in mind and in body, to such an extent that she was an easy prey to the designs of defendant, unable to resist his importunities, and between April 26, 1934, and April 26, 1936, her said condition was such that she was incapable of knowing what she was doing, or comprehending the ordinary routine of her daily life and the terms and effect of any business transaction, or the management of her business affairs, and she was unable in law and in fact, to transact any business, or to make any valid disposition of her property. At all times this condition was known to defendant, for the most confidential relationship existed between his mother and himself and she reposed the greatest confidence and trust in him, and entrusted him with the conduct of her business affairs, believing that he would deal fairly and justly with her. Defendant, however, with the object and intention of securing a large portion of her property for himself alone, depriving her of it and preventing his brothers and sister from receiving any part, gained control and domination and an undue influence over her mind and affection. While managing her property he took advantage of the confidence and trust which she reposed in him, and used it to induce her to deliver and entrust large sums of money to him, all in pursuance of his fraudulent purpose. He paid no consideration for this money, nor was it intended to constitute a gift to him. He secured possession of it solely by reason of his exercise of said undue and fraudulent influence.

The money obtained by defendant from his mother, commingled with such personal funds as he may have possessed, was used for divers purposes. Substantial amounts were invested and reinvested. Personal loans were made and property and security interests were acquired, title being taken in some instances in the name of the mother, in other instances in her name and that of defendant as joint tenants, or in his name alone, or in his name and that of a woman friend as joint tenants. Some of these interests were found by the

trial court to belong to defendant, but one parcel of real property, standing in his name and that of his mother as joint tenants, was found to be held by him in trust for her estate. He takes no exception to these findings or to the portions of the judgment predicated upon them. His sole contention is that the evidence fails to support the further findings upon which the court based its adjudication that plaintiff is entitled to recover the sum of $13,431.49.

This total amount of $13,431.49 is made up of twenty-nine smaller sums of from $50 to $1,029, representing moneys received by defendant from his mother on various dates between March 14, 1927, and January 1, 1936, together with interest thereon from said respective dates. Instead of investing these sums for the mother's use and benefit, so the court found, defendant repudiated the trust, and retained and converted the funds to his own use and benefit.

The first eighteen items, totaling the sum of $3,874, exclusive of interest, cover the period from March 14, 1927, to October 25, 1928, and represent withdrawals made by defendant from a joint account in his name and that of his mother in the Morris Plan Company. This account was opened on December 1, 1926, and closed on October 25, 1928. Defendant testified that practically all of the money which passed through it belonged to his mother, that he could not recall any item which was his own, that it was difficult for his mother to get downtown and the purpose of putting her money into the joint account was to facilitate withdrawals, and that most, if not all, of the withdrawals were made by him. He could not recall just what he had done with the various amounts withdrawn, but stated that he had given them to his mother, or deposited them in her commercial account, or used them to pay her expenses, or for investment. He could not recall the exact nature of the investments or give any definite information as to the disposition made of them. He claimed, as a gift from his mother, one item of $800, withdrawn on October 20, 1928, and used to pay a judgment against him.

Attorney French testified that just after October 25, 1928, the day upon which the account was closed, he went with defendant's mother to the office of the Morris Plan Company, and when she came out she told him that all of her money was gone. He thereupon prepared a notice for her to sign,

dated October 29, 1928, stating that until further order in writing all payments on account of any indebtedness due her or the estate of her husband should be made by check to her or to her attorney. This notice was forwarded to the Morris Plan Company. During the period the Morris Plan account was in existence, the mother also had a commercial account with another bank, upon which she was constantly drawing.

It is evident that the trial court discredited defendant's entire testimony with respect to the disposition made of the funds withdrawn from the Morris Plan Company. Defendant asserts that inasmuch as his statements were uncontradicted, the court could not thus ignore their purport. This, however, is not a correct statement of the law. It is within the province of the trier of facts to disbelieve and ignore the uncontradicted testimony of a witness, where such testimony is so surrounded by elements of uncertainty, improbability and fraud as to justify the disbelief. (*Willits* v. *Helmer,* 47 Cal. App. 309 [190 Pac. 645] ; *Bohn* v. *Gruver,* 111 Cal. App. 386 [295 Pac. 891] ; *Davis* v. *Judson,* 159 Cal. 121 [113 Pac. 147] ; *Herbert* v. *Lankershim,* 9 Cal. (2d) 409 [71 Pac. (2d) 220].) In the present case these elements were not lacking. The presumption arising from the confidential relationship of defendant to his mother, and the fact that her strength was impaired mentally and physically, and that she was under his undue influence, coupled with his evasive statements and inability to account for her funds, or to recall the use to which they were put, amply justified the trial court in concluding that his real purpose in opening the joint savings account was to enable him to have access to her money for his own purposes, without the necessity of having her sign for its withdrawal.

The last eleven of the twenty-nine items going to make up the money judgment cover the period from August 10, 1929, to January 31, 1936, and total the amount, exclusive of interest, of $5,204.43. They represent sums secured by defendant from his mother, or from a joint bank account which he had with her in 1935 and 1936 and also moneys borrowed by defendant on his credit and that of his mother and used in a series of financial manipulations. These transactions will not be separately analyzed. With respect to each item representing money taken by defendant and used to purchase assets in his own name, or jointly in his name and that of his friend,

the investment was shown to have been preceded or accompanied by a withdrawal of the mother's funds in substantially the same amount. The method used by defendant in the 1934–1935 series of financial transactions was to borrow from the bank on promissory notes executed by himself and by his mother as comaker and to use the money for investment and reinvestment, or for his own purposes, and then to have the notes paid by arranging with the bank to make a debit entry against the mother's account. As collateral to secure payment of the notes, defendant pledged with the bank certain secured loans, some belonging to him and some to his mother. As assets were purchased, frequently they too were pledged. At the time of trial of this cause a substantial amount was still owing the bank, and by the judgment herein certain real property owned by defendant is subjected to a lien to indemnify the mother's estate against the possibility of having to pay such indebtedness. Defendant makes no criticism of this lien order in itself, although he comments that collection of the $13,431.49 money judgment will deprive him of all means of paying the bank, with resultant loss of both his real estate and the collateral pledged with the bank. Neither does defendant claim that all items have been improperly assessed against him, but he asserts that in the accounting the charges have been pyramided, a number of the items have been duplicated, and certain credits to which he is entitled have been withheld. However, he does not set forth the precise amounts claimed to represent duplications of charge, or say for exactly which items he feels he may justly be held liable. A review of the record fails to reveal any duplication or pyramiding; in fact, it indicates that the assessment of an even larger sum against defendant would have found support in the evidence. Defendant's claims are therefore unwarranted.

One of the main contentions made by defendant is that of failure on the part of plaintiff to sustain the burden of establishing a trust over the specific funds in question. Defendant claims that he was called upon to state what was done with practically every withdrawal from his mother's bank account over the period involved, and that the trial court then penalized him for his failure to keep an accurate account of her affairs by simply charging him with each item which he was unable to explain—and this despite the fact

that the evidence showed without contradiction that he did not have exclusive control of her affairs. While admitting liability for any of his mother's money which he actually received, the burden, he claims, was upon plaintiff to prove just what specific funds he did receive, and this burden was not met by the negative evidence under which he was charged with all sums as to the disposition of which he was unable to produce a record.

This argument overlooks the effect of the relation between defendant and his mother, and of his commingling of her funds with his own. The evidence, as shown by the findings to which no exception is taken, established defendant's relation to his mother as one of trust and confidence, and his status as that of a constructive trustee, charged, by reason of the undue influence which he exerted over her with a duty to account fully with respect to his handling of her affairs. Upon the uncontradicted showing that he had access to certain of her funds, and that they passed through his hands, and that his property and hers were commingled, and that no accurate or complete accounts were kept, the burden was upon him to prove that he acted in the utmost good faith in handling such funds, and that he did not appropriate them for his own purposes. (*Herbert* v. *Lankershim,* 9 Cal. (2d) 409, at pp. 426, 427 [71 Pac. (2d) 220], and cases there cited; *Estate of Miller,* 16 Cal. App. (2d) 141, 167 [60 Pac. (2d) 492]; 65 C. J., sec. 899, pp. 972, 973; *Moseley* v. *Fikes,* (Tex. Civ. App.) 126 S. W. (2d) 589.)

In the case last cited the court, quoting from *Meyers* v. *Baylor University in Waco,* (Tex. Civ. App.) 6 S. W. (2d) 393, said: "It is quite true that the burden of proof was upon plaintiff to establish the trust but, when proof of the fiduciary relationship of the parties was made, the betrayal of the trust, the probable amount of the embezzlements shown, a *prima facie* case was presented, and the burden was then on Meyers to show, if he could, that his money, and not that of the plaintiff, paid for the properties in whole or in part. . . . As stated in our conclusions, Meyers deposited his own and money embezzled from plaintiff to his personal credit in the banks, thus destroying the identity of the funds; hence the whole mingled fund became subject to the trust, as well as all property purchased therewith. The rule applicable to these facts is clearly and satisfactorily stated in 39 Cyc., p. 538, as fol-

lows: 'Where a trustee so mingles the trust fund or property with his own, or so invests it in property together with his own, that the trust fund or property cannot be separated, or the amount of each ascertained, the whole mingled fund or property becomes subject to the trust, except so far as the trustee may be able to distinguish or separate his own fund or property, the burden of making such distinction or separation being on the trustee or his representatives; and this rule applies so long as any portion of the fund or property into which the trust fund or property can be traced, remains.' ''

Defendant offered no convincing proof that any of the items charged against him were his own property, or that any credits were wrongfully denied him. He also failed to show that he himself was possessed of sufficient property or earning power to account for the assets standing in his name at the time of his mother's death. With respect to his own financial condition, he testified that in 1925, he owned some stock of an electric appliance shop, a truck, a lot, $5,000 or $6,000 in bills receivable, and personal property. He was indebted to his father in the sum of over $2,000. No evidence was introduced as to the value of the stock or personal property, or the amount actually realized from the bills receivable. He only operated the appliance shop for a few months after his father's death, although for a year or so he carried his stock in trade on the truck and sold from it. After 1930, he devoted himself to day labor, cutting and selling wood from his mother's ranch, sales of produce, making loans, and occasional appraisements for which he received a fee. At no time subsequent to 1925 did he file an income tax return, or pay personal property taxes. Taxes on certain real property owned by his mother were allowed to become delinquent after 1932 or 1933. For a year or two he maintained a small checking account. Later he used his mother's account, stating as his reason: "I used my mother's bank account to make deposits and withdrawals for the reason that there was a penalty if an account dropped below $100, and also a charge for collecting checks, and I never at all times had a balance of $100 cash of my own at hand."

The mother kept no record of her affairs and the accounts of defendant are so meager and unintelligible as to be valueless. In fact, as commented by the trial court, they indicate, if anything, a deliberate attempt on the part of defendant to

confuse his mother's affairs, and commingle her property with his to such an extent that no asset can with certainty be proved to belong either to him or to her, thus putting him in a position to lay claim to both his and hers without fear of contradiction.

The fact that defendant's handling of his mother's affairs was not exclusive, as she was also subject to the demands of her other children and relatives, is of no material significance because defendant is charged only with items traced to funds which came under his control.

Defendant presents an analysis of the evidence designed to show that his mother's estate increased in value over the period of his conduct of her business, whereas the property claimed by him represents no more than a balance substantially equal to his original assets, and from this premise he argues that the amount assessed against him is not justified. His analysis, however, is of no weight because it does not contain an accurate listing or complete accounting of all items of property referred to in the evidence.

No other questions merit discussion. There is in the evidence, and in the inferences which may legitimately be drawn from it, sufficient support for the trial court's findings and conclusions.

The judgment is affirmed.

Shenk, J., Curtis, J., and Gibson, C. J., concurred.