**BROWN v. NEW YORK LIFE INS. CO.**
**et al.**
**No. 1412.**

District Court, D. Oregon.
June 12, 1944.

tional Bank of Burns, Oregon, and dated from November 29, 1935, to October 21, 1940.

Edward N. Brown was employed by the Harney County National Bank beginning in the year 1927, as teller, and in other capacities. On January 12, 1932, he became assistant cashier and on January 7, 1936, he also became a director. Upon becoming vice president on January 11, 1938, which office he held until his death on August 6, 1942, he gave up the position of assistant cashier.

During the years of his connection with the bank, Brown embezzled $416,000. The audit shows that the net amount of defalcations from customers' accounts alone amounted to approximately $6,000 before 1935 and to over $12,000 during that year. The schedule of further withdrawals from this source alone, during the stated periods, follows:

| 1936 | $ 3,031.52 |
| 1937 | 17,996.84 |
| 1938 | 40,982.14 |
| 1939 | 93,203.44 |
| 1940 | 39,780.33 |

Brown carried a personal account, a special account and a commercial account at the bank in which he deposited sums from various sources. At no time was the total amount in all of these accounts, on any particular date, equal to the sum of his defalcations to that date from commercial accounts of the bank alone.

There were showings that Brown owned properties for which he had paid cash, that he had received loans and had sold property and received the purchase price, and that he had received gifts. Taking all these matters into consideration, the total amount thereof did not equal the amount of defalcations at any time. When the defalcations were about to be discovered by bank examiners, Brown committed suicide.

Ruby M. Brown, as beneficiary, made claim for the full amount of the insurance policies. Two checks were issued to her for a total sum of $20,582 by the insurance company. Upon discovery that the Federal Deposit Insurance Corporation had a claim, the insurance company stopped payment upon these checks. Upon commencement of this action by Ruby M. Brown, against the insurance company, it answered by depositing these funds in court and asking for an order requiring the claimants to interplead.

James C. Dezendorf, of Portland, Or., for plaintiff.

Robert F. Maguire, of Portland, Or., for defendants.

JAMES ALGER FEE, District Judge.

On November 27, 1935, the New York Life Insurance Company issued two policies of insurance on the life of Edward N. Brown in the sum of $10,000 each, in which policies Ruby M. Brown was named as beneficiary. The premiums on these policies were, with one exception, paid by checks drawn upon the Harney County Na-

254

Based upon a stipulation, an order was entered discharging the New York Life Insurance Company of liability and setting up adversely the claims of plaintiff and the Federal Deposit Insurance Corporation.

A pretrial conference was held between the Federal Deposit Insurance Corporation, intervenor, which was the assignee of the assets of the Harney County National Bank, and Ruby M. Brown, the mother and beneficiary of the insurance policies on the life of Edward N. Brown. The results of this conference were crystallized in a pretrial order which accurately defines the questions of fact and law to be answered by the court.

The matter thus arises between the beneficiary (who paid nothing therefor) of insurance policies upon the life of an embezzler and the assignee of the assets of the bank from which he embezzled. The cardinal factor is, that no item of the embezzled funds is traced directly into the premiums of the insurance policies, nor into the bank accounts, which Brown maintained with the Harney County National Bank.

This cause is complicated by the geometrical increase of the fact-pattern. Reduced primarily to the lowest terms, it is relatively simple of solution. First, if Brown were alive, could the bank recover from him the moneys paid out by virtue of checks drawn by him and from his transferee without notice, but without consideration.

The sole ground of recovery by the bank against the transferee would be that a trust had been erected by the use of money of the bank in that transfer.

In order to further clear the ground, a distinction must be drawn between transactions which are consensual and in the normal course of business, and those which are colored by a proven fraud.

In the first category are placed dealings presumed to be innocent between solvent parties and which occur as ordinary commercial transactions. Thus, where a person brings cash into a bank which accepts it, the relation is that of debtor and creditor. When such a customer writes a check, the bank pays out its own money but is entitled by the implied contract of deposit to charge to the account of the customer the amount thereof. If the customer

writes and presents a check for more than he has originally turned over to the bank, there is no obligation to honor the demand. If the bank does pay the check, the transaction is a loan to the customer. The drawee, even if he paid no value therefor, is not liable to the bank.

If the bank loans money to the customer and the loan has matured, the bank has a right at any time to set off the amount owed to it against the amount owed by it. The bank thereby becomes liable only for the remaining balance of its debt to the customer, if there be any. But if the bank does not exercise this right of set-off, and, in the face of the obligation of the customer to it, pays the check, it will have no recourse against the drawee of the check and can neither recapture the money nor follow the proceeds thereof.

Likewise, a solvent corporation may pay the personal debts of its officers and directors by corporate check and while there is no doubt of its right, itself or through its assignee, to recover from the officers, it has no right against the payee, although the face of the check conveyed notice of the transaction and even though no value was given therefor.[1]

Also, a corporation which is solvent may make an agreement with its officers who are the sole stockholders, to make payments on insurance policies upon the lives of each of these respectively. If the agreement is carried out, there will be no right upon the part of the corporation or its assignee to recover the proceeds of the policies,[2] when it becomes insolvent.

Now there is a like distinction to be observed in considering relations which are given sanction by the courts as trusts. Shortly, express trusts and implied trusts such as those called resulting trusts, are consensual in origin. With such relationships, the presumptions of innocence and fair dealing apply. A constructive trust, on the other hand, is one imposed by law because of proven fraud, duress or undue influence exercised by the party charged.

In cases of express trusts, since it is assumed the trustee is acting innocently so long as he maintains a balance sufficient to cover the exact amount of the trust fund in a bank account, he is given credit for paying out his own funds in any expenditures.[3] Therefore, if he purchases life in-

---

[1] Sweet v. Lang, 8 Cir., 14 F.2d 762.

[2] Oliver v. Northwestern Mutual Life Ins. Co., D.C., 2 F.Supp. 266.

[3] See Portland Building Co. v. State Bank of Portland, 110 Or. 61, 222 P. 740.

surance by check upon the same bank account, the premiums are deemed his and the proceeds of the policies inure to his beneficiary. If the trustee has two trust funds, one of which was given him for the purpose of insurance, and he did purchase insurance and there was not sufficient to cover both funds remaining, it will be presumed that he paid the premiums out of the fund entrusted to him for that purpose.[4] It is likewise held that where the trustee of an express trust reduces the amount in the bank where he had deposited his own funds and trust funds, below the sum of the trust moneys, and thereafter introduces into the account his own money, the latter sum is not in restitution, but is assumed to remain his in the absence of clear intention to make restitution. The presumption here again is in favor of fair dealing. It is assumed that the trustee withdrew the moneys from the trust in accordance with the purposes thereof. Finally, it is held that where there is an express trust, and the trustee is dead and cannot explain the mingling of funds, the burden of tracing remains with the cestui que trust.[5] Here again, the presumption of innocence prevails.

But the courts are equally clear in holding that where the trustee of an express trust commingles funds and is unable to explain the transaction, the whole becomes a trust fund.[6] This is because the presumption has been dissipated.

When the field of constructive trusts is approached, there is a relation imposed by the courts, between parties, to prevent unjust enrichment of one to the detriment of the other.[7] The fundamental difference between such different concepts and the sanctions attendant thereon cause a wide divergence of results.

"An attempt to define a trust in such a way as to include constructive trusts as well as express trusts is futile, since a single definition which would include such distinct ideas would be so general as to be useless."[8]

These basic concepts are then entirely distinct. The failure of the courts, on occasion, to recognize this distinction of the two concepts, called by the general name "trust", leads to confusion. General-ly speaking, the courts will compel one who obtains land, personal property or money from another by means of fraud, duress or undue influence, to hold the property as though he were a trustee of an express trust.[9] In other words, by analogy, the courts reflect many incidents of an express trust in reasoning about this creation, to prevent unjust enrichment.

While express trusts are fiduciary relationships, a constructive trust need not have its origin in such a bond. But the courts impose a constructive trust upon money or property obtained through breach of the obligations by one who takes advantage of the opportunities laid open in a fiduciary or confidential relationship.[10] There the duty is plain, and the breach is usually in violation of good ethics as well as law. Thus, there is imposed the constructive trust, or the trust ex maleficio. There are two important differences between the incidents imposed by the court as a result of the finding of such a breach of duty involving transfer of property, and those applied to an express trust. In the first place, there is no presumption of innocence or fair dealing because the imposition of a constructive trust presupposes a finding of bad faith and fraud. In the second place, the duty to restore all the avails of breach of faith requires a more flexible concept than the res which canalize the obligation of express trusts.

Turning to the situation in the instant case, we find that the high duty of Brown, in his confidential capacity as a director-officer and trusted employee of the bank, was well defined. He was a fiduciary at all times. As a director he was bound by oath to diligently and honestly administer the affairs of the bank and was bound by oath not to violate himself or permit violations of the federal law relating to a national bank.[11] As an executive officer of the bank, he could not borrow or otherwise become indebted to it, or receive credit except under extremely limited conditions of which he was required to make a written report.[12] If he had known of any embezzlements or thefts from the bank, he would have been required to give the bank notice thereof in order to protect its inter-

[4] Bromley v. Cleveland, C., C. & St. L. Ry. Co., 103 Wis. 562, 79 N.W. 741.
[5] Logan v. Logan, 138 Tex. 40, 156 S. W.2d 507.
[6] Tretheway v. Tretheway, 16 Cal.2d 133, 104 P.2d 1033.
[7] Restatement of Restitution, c. 9.
[8] Restatement of Restitution, p. 641.
[9] Scott on Trusts, Vol. III, § 468.
[10] Scott on Trusts, Vol. III, § 468.
[11] 12 U.S.C.A. § 73.
[12] 12 U.S.C.A. § 375a.

ests. If he had known of any customer of the bank who had embezzled money therefrom or who was indebted thereto, and who had also placed money on deposit, if the facts were unknown to other agents of the bank, he would have been required to report it in order that the bank could protect itself by the exercise of the right of set-off or by other means within its power.

There was a breach of this duty owed by Brown to the bank, and a wilful abuse of the confidence and trust placed in him. He embezzled and misappropriated moneys and other assets of the bank in a sum of over $416,000. His realization of the criminal phases and consequences of his acts [13] and his moral and ethical responsibility therefor caused him to take his own life.

The evidence indicates that large sums of money were taken directly from the bank. When notes evidencing loans made by the bank were paid, he kept the money. When deposits were made he also took the money. He concealed all of these transactions from the other officers of the bank and the bank examiners, by a series of false entries of debits and credits on the books; by abstracting individual ledger sheets of customers from the files; by leaving notes, which had been paid, in the files of the bank as though they were outstanding; and by noting deposits which never became part of the assets of the bank, on the books of the depositors. Specifically, he violated his duty by stealing the cash of the bank; by failure to report the false entries; and by failure to notify the bank, its officers or agents, that he was in any manner indebted thereto.

The acts of Brown reveal a gross and flagrant breach of confidence imposed upon him by the bank. To this were attached the subtle tendrils which, because of the public nature of such an institution, pervaded the entire social structure of the community. He had taken an oath to guard the funds of the bank. By virtue of his position, he was enabled to carry out his unlawful enterprises. Finally, he prevented an accounting and escaped responsibility for his violations of the trust and confidence reposed in him by killing himself when assured that all would be soon discovered. The moralities required that such conduct should not pass unpunished and that no one should receive, through the embezzler, the fruits of his unlawful peculations. However, extreme care must be taken in the examination of the applicable doctrines lest we be swayed to a moral end, despite the long established rules for the control of conduct in such tangled situations. Hard cases make bad law.

It is, however, established that there was a confidential relationship and a breach thereof. But according to the definition of a constructive trust, property must pass into the hands of the persons upon whom the courts impose it, or by his machinations, into the hands of third parties in order to lay a basis for recovery. There is no doubt that upon the discovery that the funds had been stolen, the bank could have recovered from Brown in some of the forms of assumpsit or debt, but under the doctrines of restitution it could not recover specific property from him, or from a third party, unless it could be proven that the funds so abstracted from the bank were included therein, or were part of the purchase price thereof. Therefore, unless the stolen funds could be directly traced into specific articles of property, or into life insurance premiums, there could be no recovery by the bank of the articles or proceeds of the policies, notwithstanding the immoral and illegal operations of Brown and the great loss caused to the bank thereby.

But the ministers of the law are not confined to one foundation for a constructive trust. They may follow fraud in all its protean forms. Once having established that the acts of Brown were in violation of his duty as a fiduciary, that quality is grasped firmly so that none of the benefits of recurring identity escape. "No man can take advantage of his own wrong." No one is held more strictly to the observance of this axiom than one whose fiduciary character is established. Therefore, before attempting to trace directly the funds actually taken by Brown, consideration should be given to the other duties which he violated and the consequences thereof.

His duty required him to disclose the fact of his indebtedness to the bank and to actually exercise the right of set-off for the bank as to any moneys which he might deposit therein irrespective of the source.[14] His duty to the bank, likewise,

---

[13] 12 U.S.C.A. § 952.

[14] See Atherton v. Anderson, 6 Cir., 99 F.2d 883; Live Stock State Bank v. First National Bank of Fairfield, Idaho, D.C., 300 F. 945.

required him to disclose the fact of his indebtedness and to accept no payments as salary or interest from the bank without full disclosure. He was, therefore, required, in view of all his knowledge of the facts, to apply all the salary payments to the liquidation of his indebtedness.

In Phillips v. Chase, 203 Mass. 556, 89 N.E. 1049, 1052, 30 L.R.A.,N.S., 159, 17 Ann.Cas. 544, the defendant fraudulently procured the adoption, by his wife, of his own son by a former marriage in order to secure his wife's property for his son, thinking that if his son got the property the defendant would benefit thereby. After the death of both wife and son, the decree of adoption was set aside in order to prevent the defendant from thus obtaining property unjustly. The court say:

"It was established by the answers given by the jury on the issues tried by them that the adoption of his son Woodruff was procured by a gross fraud practiced by Dr. Chase upon his wife and upon the court.

"The law will not allow a man to profit by his own wrong doing. Adopting and adapting the words of Mr. Justice Field in New York Mutual Life Ins. Co. v. Armstrong, 117 U.S. 591, 600, 6 S.Ct. 877, 881, 29 L.Ed. 997, 'it would be a reproach to the jurisprudence of the country' if that were not so.

"It is settled that the English common law is not open to that reproach. It has been twice laid down in Great Britian, once by Lord King in Bovey v. Smith, 1 Vern. 60, and once by Lord Redesdale in Kennedy v. Daly, 1 Sch. & Lef. 355, 379, that one who obtains property by a breach of trust and afterwards buys it from a bona fide purchaser for value does not get a good title to it although every one else in the world buying under those circumstances would get the title of the bona fide purchaser for value. And that has been decided in New York (Clark v. McNeal, 114 N.Y. 287, 21 N.E. 405, 11 Am.St.Rep. 638), and in Maine (Bailey v. Bailey, 61 Me. 361)."

■ Where a fiduciary is guilty of a breach of duty and acquires property or money by reason of his tortious conduct, the person to whom the duty is owing may have restitution of the benefit thus obtained, either from the faithless fiduciary or from the person who has obtained the property from him, except the latter be a bona fide purchaser for value.[15]

■ Even if this principle were not available, still constructive trusts are imposed where a person is entitled to recover money which he has paid to another on account of the terms of a contract which he supposed to exist and which, to the knowledge of the other party, did not actually exist, whether failure of consideration or some other defect was responsible for the condition.[16]

■ Brown paid practically all premiums on the policies in question out of accounts maintained at the same bank from which the tremendous sums above mentioned were stolen. If Brown had taken the money which he stole from the bank, and placed it in cattle, there would have been no question of the right of the bank to recover the cattle against anyone, except a holder for value in good faith. If Brown had not deposited money in the bank, but had, on the records thereof, set up entries showing that he had an account there when in truth he had none, and his checks were cashed which paid for cattle, it could not be held that the money so paid was his money, and therefore the bank, under like circumstances, could recover.

But it is said that when Brown actually deposited money, it remained his until the bank actually exercised its right of set-off. The bank would, of course, have exercised this right if the defalcations were known to it at the time. This argument simply means that where a thief is successful in concealing his abstractions, the ill gotten gains will be protected, whereas, if the abstractions had been timely discovered, the losses could have been recouped. Besides, as above noted, the failure to notify the bank or make the set-off was itself a fraud.

If Brown, as an officer, had set up a fictitious set of entries purporting to show that he had an account in the bank where he had made no deposits, and had paid for cattle with the proceeds, the result would be

---

[15] Restatement of Restitution, §§ 138, 190, and 201; Restatement of Agency, §§ 314, 403, 404 and 407; Restatement of Trusts, §§ 197 and 226.

[16] Restatement of Restitution, §§ 15 and 16. "Payments as a result of fraud or misrepresentation are within the rule stated in this Section. In such cases the payor is entitled to restitution although his mistake was not basic. The rules specially applicable are stated in §§ 8, 9 and 28."

258

the same. If Brown had abstracted moneys from a till in the bank and it had been proven that he deposited these moneys in a valid bank account in his own name, and had issued a check thereon in payment for cattle, and there were no more moneys in the account than those stolen, the bank could still recover the cattle. Where Brown, by virtue of his position as employee, director and officer, surreptitiously embezzled funds from the bank and thereafter deposited funds in the bank, the bank could not become indebted to him by virtue of such a deposit, until he had repaid all he had unlawfully abstracted. If then, in ignorance of the true situation, through his fraud, the bank honored checks on a supposititious account, it paid out its own money and not that of Brown. It was deluded into believing it paid the money of Brown, but the situation was no different than if Brown had made no deposits. Therefore, if Brown had bought personal property with this money of the bank, the latter could have recovered.

The options which one whose money is stolen has against the defaulter are clearly developed in the scholarly opinion of Judge Learned Hand in Primeau v. Granfield, C. C., 184 F. 480,[17] which illuminates the field. A learned review of the subject is made by Judge St. Sure, writing for the Circuit Court of Appeals of the Ninth Circuit, in Republic Supply Co. of California v. Richfield Oil Co., 79 F.2d 375, where like reasoning is followed.

The results of this reasoning were squarely stated by the court in McConnell v. Henochsberg, 11 Tenn.App. 176, in an able and well worked out opinion upon facts almost identical with those in the case at bar. Criticism is made of the application of that case to the situation here because of the fact that the court says "it is evident that several thousand dollars of this stolen money was used by Henochsberg and did actually pass through his bank accounts." The same finding could be made in the case at bar. However, this court does not place the decision here upon that basis, but upon the broad ground upon which the Tennessee court may also have relied, that the fiduciary who obtains property by breach of his obligations of confidence cannot equitably retain it.

American National Bank v. King, 158 Okl. 278, 13 P.2d 164, deserves but slight consideration upon this issue. The court there held that a finding by the lower court that the premiums upon life insurance policies of its defaulting president were not paid by moneys of the bank was not against a fair preponderance of the evidence. The principles of law relating to this feature were not discussed. The scholarly treatment of the remedy of restitution in like circumstance in the Tennessee case is not mentioned, nor is that case cited. The court apparently entertained an emotional dislike for the doctrine of recovery of the proceeds of an aleatory contract and upon this feeling the case is founded.

The result is, that the Tennessee case is the only reasoned case upon this particular set of circumstances. Inasmuch as this decision squares with correct doctrine, as indicated by the previous discussion, it will be followed upon this point. All the money paid out upon checks issued by Brown against his paper accounts belonged to the bank. By his fraud and false representations, he had prevented the bank from withholding his salary payments and from exercising its right of set-off. Whether the payments were made for salary, or in honoring his checks, the bank made them by mistake of fact, pursuant to obligations which it believed it owed to Brown.

There is an alternative and equally convincing theory upon which the same conclusion may be founded. A review of the evidence which, although indirect, is convincing, makes clear that since Brown had no other sources of income initially, except his salary and the embezzled funds, that the bulk of the moneys which he deposited was from these springs. None of the stolen money can be traced directly thereto, but any fact may be proven by direct or indirect evidence. This leads to a consideration of an analogous line of cases where the defaulter is not an employee of a bank but deposits the stolen funds therein. It will be apparent that the doctrine just held controlling would not apply under such circumstances. However, the courts reach the same result on the ground that once fraud has been proven, the doctrine of commingling of funds applies[18] and the constructive trustee will be liable if he does

[17] Reversed on other grounds. Primeau v. Granfield, 2 Cir., 193 F. 911.
[18] Massachusetts Bonding & Insurance Co. v. Josselyn, 224 Mich. 159, 194 N. W. 548; Moseley v. Fikes, 136 Tex. 386, 151 S.W.2d 202; Long v. Earle,

not segregate the fund. Since there is no presumption of innocence attaching, his death will not protect the beneficiaries.[19]

In the case of Truelsch v. Northwestern Mutual Life Insurance Co.[20] there is an illustrative example of a situation where the defaulter was not an employee of the bank where he deposited his funds. The court there finds from indirect evidence that the money stolen was deposited in the bank and paid out by check upon the premium. The court disregards the question as to whether salary paid belonged to the employer, but treats the whole bank account, which may have contained some salary payments, as a commingled fund. The fact that the defaulter was dead did not prevent the application of this doctrine.

Thus it is, that all the moneys paid out by the bank belong to it. Therefore, if Brown had bought cattle with the proceeds, the bank could have obtained this property in specie from anyone except a bona fide purchaser for value. It is objected that while such property could have been recovered, it is a grave injustice to permit the recovery of the proceeds of an aleatory contract such as an insurance policy on the defaulter's life. However that may be, the question is settled in the State of Oregon by the decision in Jansen v. Tyler, 151 Or. 268, 47 P.2d 969, 49 P.2d 372, wherein is cited the able opinion of the elder Judge Sanborn reported as Vorlander v. Keyes, 8 Cir., 1 F.2d 67.

The Vorlander opinion just cited is repudiated by the Oklahoma court in American National Bank v. King, supra. The rationale of the last mentioned opinion is that the wife and minor children of a defaulter have an investment in his life which should be given to them despite his wrongdoing.

In this case, the full amount of the insurance will not cover the peculations. There is a strong public policy against permitting a wrongdoer from thus taking advantage of his own wrong in order to build up an estate which the law will render secure for his successors as against the person from whom the money was stolen.

The status of the wife or mother who is innocent of fraud and who is beneficiary of these "solemn contracts of insurance" according to plaintiff's brief is well stated in the Vorlander case, 8 Cir., 1 F.2d 67, 69, 70: "Nor may another, in this case the wife, now the widow of the trustee ex maleficio, though herself innocent of the fraud, who has paid no consideration for the property purchased with the misappropriated funds or for their fruits, hold any of them against the cestui que trust, the owner thereof. A third person, unless he or she has in good faith acquired for value without notice a subsequent interest, seeking any benefit resulting from the misappropriation becomes a particeps criminis however innocent of the fraud in the beginning. Story's Equity Jurisprudence (14th Ed.) §§ 1666, 1667, 1668, 1669, 1670; Perry on Trusts, §§ 127, 166."

The bank would have, therefore, been entitled to recover all of the proceeds of the insurance which was paid for by checks drawn on the fictitious accounts of Brown therein. However, as to the payment of the premium made December 28, 1940, on policy No. 12748022, there is no evidence from what source this was made. Recovery could not then be had by the bank of the proceeds thereof on the theory that the payment was traced into a commingled fund. On the other hand, to allow recovery upon the theory that the funds were commingled when placed into the insurance policies would violate the principles laid down in the Jansen case above cited.

Finally, it is objected that no matter what were the rights of the bank, the intervenor could not succeed to them because, having assumed the deposit liability of the bank, the obligation was thus satisfied. It is assumed that this objection can be based upon American Surety Company v. Bank of California, decided by this court in an opinion reported in 44 F.Supp. 81, and affirmed by the Circuit Court of Appeals for the Ninth Circuit in an opinion reported in 133 F.2d 160. The confusion of plaintiff seems to arise from the fact that no account is taken of the specific contract made in these two cases. The American Surety Company had there become responsible for the fidelity of the embezzler and when the proceeds of the wrongdoing were replaced, the obligation

---

277 Mich. 505, 269 N.W. 577; Meyers v. Baylor University, Tex.Civ.App., 6 S. W.2d 393, 394.

[19] See Meyers v. Baylor University, supra.

[20] Truelsch v. Northwestern Mutual Life Insurance Co., 186 Wis. 239, 202 N.W. 352, 38 A.L.R. 914.

was completely satisfied. Here, the Federal Deposit Insurance Corporation was under duty simply to replace the assets, no matter how the loss occurred. It has no specific responsibility for the fidelity of Brown. When it carried out the obligation to replace the assets lost, it acquired the right of the bank against the wrongdoer. Both these cases are ruled by Oregon decisions. The American Surety Company case is governed by the opinion in the case of American Central Insurance Company v. Weller, 106 Or. 494, 212 P. 803. This case, on the other hand, is governed by the Jansen case above cited.

Findings and judgment may be prepared in accordance herewith.