[Civ. No. 21123.   Second Dist., Div. Three.   Oct. 17. 1955.]

Estate of CORNELIUS TILLMAN, Deceased. JOHN H. WHATLEY, Appellant, v. LORNA SLOAN, Respondent.

John H. Whatley, in pro. per., and Brown, Hamill & Hunt for Appellant.

Zephyr M. Ramsey for Respondent.

ASHBURN, J. pro tem.*—This is an appeal from a judgment denying probate of a letter of decedent Cornelius Tillman which proponent claimed to be a holographic will. Prior to presentation of the letter for probate a formally drawn and executed will of December 7, 1953, had been admitted to probate, respondent Lorna Sloan had been appointed executrix and had qualified and acted as such. John H. Whatley petitioned for the probate of the letter and sought appointment of himself as administrator with the will annexed. He has taken this appeal but the real party in interest appears to be decedent's nephew, Spencer Tillman. The ruling was that the letter was not signed or sent with testamentary intent and hence did not constitute a holographic will.

The text is as follows: "Pasadena Calif Jan 8 1954 Dear Spencer My Dear Nephew I Reseive your letter was so glad to hear from Hope that you can come out you come on out hear I will Pay your money back to you. Spencer what I have is for you and your family—you Let me no what you ar going to do & when you are going to start I have Something to talk over with you Let me hear from you From C. Tillman 1045 N Wilson ave." Spencer resided at West Point, Mississippi, and received the letter there.

The evidence upon this question of intent consisted largely of declarations made by decedent both before and after the date of the letter. The controlling principles here applicable are stated in *Estate of Sargavak,* 35 Cal.2d 93, 95-96 [216 P.2d 850, 21 A.L.R.2d 307]. ■ "Before an instrument may be probated as a will it must appear from its terms, viewed in the light of the surrounding circumstances, that it was executed with testamentary intent. The testator must have intended, by the particular instrument offered for probate, to make a revocable disposition of his property to take

---

*Assigned by Chairman of Judicial Council.

effect upon his death. [Citing cases.] It bears emphasis that we are here concerned not with the meaning of the instrument, but with the intention with which it was executed. ■ Regardless of the language of the allegedly testamentary instrument, extrinsic evidence may be introduced to show that it was not intended by the testator to be effective as a will. [Citing cases.] . . .

■ ''The extrinsic evidence in this case consists for the most part of the oral declarations of the testatrix before and after the execution of the instrument in question. Such declarations, whether made at, before, or after the execution of the instrument are admissible, if offered for the purpose of ascertaining the intent with which the instrument was executed (citing cases), and not for the purpose of proving the meaning the testator attributed to specific provisions of an admitted will. [Citing cases.] 'Such . . . declarations of intent to make a will are admissible when the attempt is not to explain an ambiguity but to show the testamentary character of a letter.' [Citing cases.]'' The significance of this language is emphasized by the ruling in the later case of *Estate of Sargavak*, 41 Cal.2d 314, 319 [259 P.2d 897], where the interpretation of the same document was the problem presented. ''While declarations of the testator before and after the execution of the will are admissible for the purpose of ascertaining the intent with which the instrument was executed, they are not admissible 'for the purpose of proving the meaning the testator attributed to specific provisions of the admitted will. [Citations.] ''Such . . . declarations of intent to make a will are admissible when the attempt is not to explain an ambiguity but to show the testamentary character of a letter.'' ' ''

■ Moreover, '' 'before a document will be admitted to probate as the last will and testament of a decedent, it must satisfactorily appear that the maker of the instrument intended *by the very paper itself* to make a disposition of his property . . .' '' ■ And ''where there exists a previously made and unrevoked will of the testator, the later holographic instrument claimed to be a will should be so phrased that there can be no doubt from its language that the intention of the testator was thus to make further testamentary provisions.'' (*Estate of Beebee*, 118 Cal.App.2d 851, 858-859 [258 P.2d 1101].) In reviewing the evidence upon this question of testamentary intent we are governed by the familiar rule. ■ ''The rules of evidence, the weight to

be accorded to the evidence, and the province of a reviewing court, are the same in a will contest as in any other civil case. . . . ■ 'In reviewing the evidence . . . all conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. It is an elementary . . . principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any *substantial* evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court.' (Italics added.)'' (*Estate of Bristol*, 23 Cal.2d 221, 223 [143 P.2d 689].)

In 1944 decedent executed a will, prepared by his attorney Zephyr M. Ramsey, which made his wife chief beneficiary. She died and he had the attorney prepare a new will which he executed on December 7, 1953, being the one which was probated in this proceeding. It leaves $1,000 to his brother, $200 each to three of his wife's relatives, and $1.00 each to his three sisters and certain nieces and nephews. The residue is given to some 32 great nieces and nephews who are named therein. Spencer Tillman is not mentioned in the will, though two of his children share in the residue. Upon the 1944 will decedent endorsed in his own handwriting "Void, pay this no mind, Cornelius Tillman." He had not seen Spencer Tillman since Spencer was quite small.

The letter was written one month after execution of the probated will. It reveals that Spencer had written his uncle, apparently suggesting a visit if only he, Spencer, had the money. Cornelius was pleased, said he would refund the expense. Also: "Spencer what I have is for you and your family. . . . I have Something to talk over with you." No words of present disposition, but a suggestion of future action of some kind after seeing and talking with Spencer. According-ing to his testimony the uncle telephoned him the next day after he received the letter, asked him if he had it, told him to take care of it, "because that letter I wrote you, I am willing you all of my property for you and your family." Also that he was very sick and wanted to see Spencer, who said he would leave right away. He and his aunt, Reaby Mims (sister of decedent), left on the 12th and arrived on Sat-urday, the 16th of January. The uncle was a "mighty sick

man." Spencer further testified that the letter was first mentioned on Monday, when Cornelius again inquired if he had the letter, and told him to keep it "because on that letter I am willing you and your family all of my property." In the same conversation he asked how Spencer would like to stay out here and was told by the nephew " 'Fine, if I only had a place to stay.' He said, 'Spencer, I am giving you and your family this home, all of my property, and I want you to come and stay right in the front room here; you and your family take the whole front.' I says, 'Yes, uncle, I will.' I said, 'but I will have to go back home first and kind of get straight.' He said, 'Oh, I know that.' I said, 'Well, sure, I will be more than too glad.' '' Spencer and his Aunt Reaby stayed a month with decedent. On the day they left, according to Spencer, the uncle asked if he was sure he had the letter, and, when told he was sure, said: " 'Well, now, you keep that letter because that letter is my will that I am willing you and your family all of my property after my death.' '' Spencer also testified that decedent inquired if he would return with his family and, being answered in the affirmative, said he wanted Spencer and his family to take the whole front of the house. The sister, Mrs. Mims, testified that on the 18th, in the absence of Spencer, decedent told her that "The letter that I wrote Spencer, I will Spencer and his family all of my property after my death"; and "After my death Spencer and his family gets everything I have because the letter is my will." She also testified that her brother told her the same thing the day she and Spencer left. Each conversation of decedent with Spencer or with Mrs. Mims occurred when no third person was present. Spencer and his aunt were never told those things at the same time. Of course, there was and could be no direct proof negativing those conversations, but the conduct of Spencer after the uncle's death and testimony produced on behalf of the respondent constituted considerable and substantial evidence throwing doubt upon the testimony concerning the conversations and indicating that the letter was not written with any such *animus testandi* as those conversations would attribute to him.

By way of corroboration proponent produced the testimony of Marie August and her husband Henderson August concerning a conversation had in January by decedent with both of them, in which, according to the wife's version, Cornelius said Spencer was his precious nephew, his favorite

nephew, and he was going to write him, and "I am going to give—I want all my things willed to my nephew." Her manner of testifying was a matter for the trial judge's consideration. The husband, Henderson, said that Cornelius said he was going to write Spencer but did not say what about. He also said that he advised decedent to get someone to care for him and "just write them a will to take care of you until you die"; that Cornelius replied "he couldn't do that; he had to will some to all of his people, if it weren't no more than a dollar and a half"; that he told Cornelius that was not the way in Texas or Louisiana where he came from, that one could will to "whoever you want"; but that he did not know anything about California law. Cornelius made no reply and "it just dropped on off like that." This conversation, if it occurred, well may explain the concluding phrase of the letter, "I have Something to talk over with you." It will be noted that the tenor of the conversation according to the versions of both husband and wife looked to the future and did not assert the present existence of any testamentary writing. The letter to Spencer was written on January 8th.

The executrix, Lorna Sloan, a great niece of decedent but not a beneficiary under the probated will, testified to close relations with decedent, having lived with him for awhile and cared for his business. She said that, prior to the date of the letter to Spencer, decedent had shown her his will at the safety deposit box where he kept it; that he discussed it many times with her; that he took her to his attorney, Mrs. Ramsey, on February 22, 1954 (Spencer said he and his aunt left for Mississippi on February 13), introduced her, and told Mrs. Sloan that if anything should happen to him she was to contact Mrs. Ramsey and they were to work together to find out that his will would be carried out to the last word. She also testified that, on March 21st, at his home, when the attorney was present, he said he felt he would not live long and reminded her that she should follow his will as he had it written in his safe deposit box.

Mrs. Ramsey testified to an acquaintance of 40 years with Cornelius Tillman, he having lived with her family for about five years when he first came to Pasadena; that he regarded her parents as his foster parents, and the friendship continued until his death; when she opened a law office he promised to help her and did so as he could; she drew the will of 1944 for him and produced same in court bearing the cancellation endorsement above quoted; she also drew the 1953 will under

his instruction, using information as to the many relatives which was furnished by him; that he brought Mrs. Sloan to her office on February 22, 1954, introduced her and said she was executrix under his will. Also that she, Mrs. Ramsey, went by his home two Sundays before his death and Mrs. Sloan was there; he said he was really slipping and "You and Lorna both know my business and you both can work together on the will to see that my wishes are carried out . . . and I want my will carried out to the letter." The plain inference is that he never mentioned the letter of January 8th to Mrs. Sloan or Mrs. Ramsey.

Cornelius died on April 2, 1954, leaving an estate later appraised at about $40,000, and Spencer came to the funeral accompanied by "two white men," Roy B. Davis and John Anderson. Mrs. Sloan testified that after the funeral she told Spencer, Aunt Reaby and the two men that there was a will, invited them to go to the attorney's office to see it; that Spencer did go and Mrs. Ramsey read the will to him, called off the names of the children mentioned in it and Spencer told her who each one was, his own children being among them; Mrs. Sloan told Spencer she was executrix, he examined the will and made no mention of the letter or any other will. Mrs. Ramsey testified to the same visit, the showing and reading the will to Spencer, his identifying the children named in it; he "was very disappointed in that no bequest was made to him"; he made no mention of having a later will; did say the uncle had given him the car and asked if he could take it; that he made three visits to her office, once with Aunt Reaby, and once with the two men from Mississippi; that the will was discussed each time and he said nothing about having a later will. Though present at the trial Mr. Anderson was not called as a witness. Mr. Davis was called by objector-respondent and testified that he went to Mrs. Ramsey's office once with Spencer; that she showed an unsigned will which she said was a copy and read it in Spencer's presence.

Spencer was the first witness. Before hearing any testimony of Mrs. Sloan, Mrs. Ramsey or Mr. Davis, he was asked in cross-examination when he found out that his uncle had a will other than the letter and he said, "I don't know anything about that he had another one"; "I don't know anything about he had another will"; and "I did not find out" that he had another will. Asked about visits to the attorney's office after the funeral he said he went there but once, to see about opening the "balance box," not to find out about the will; that he did not ask to see the will, did

not read it or hear it read by Mrs. Ramsey, but that she did start talking about one she had in her hand; that he did not tell her anything about his having a will; that he did not say his uncle had given him his car or ask if he could take it; that he did not tell Mrs. Ramsey that Alice and Spencer Tillman were his children; that he went to her office but once and that was in the company of Mr. Davis and Mr. Anderson; that he did not go there with Mrs. Sloan or his Aunt Reaby. Mrs. Mims said on cross-examination she did go to the Ramsey office with Spencer, Davis and Anderson, but not with Lorna Sloan. She was not asked what occurred there and was not recalled for that purpose after Mrs. Sloan and Mrs. Ramsey had testified. Nor was Spencer or any other witness called to contradict them in any respect.

█ The conflict between the testimony of Spencer on the one hand and that of Mrs. Sloan and Mrs. Ramsey on the other was such that the trial judge could properly reject Spencer's testimony either in its entirety or as to any part of it. (*Murphy* v. *Ablow,* 123 Cal.App.2d 853, 858 [268 P.2d 80].) And the court was free to disbelieve the testimony of the Augusts, if so advised. █ The judge was not bound, merely because there was no direct contradiction of the testimony of Spencer and his aunt as to conversations with decedent, to give credence to that testimony. █ "The most positive testimony of a witness may be contradicted by inherent improbabilities as to its accuracy contained in the witness' own statement of the transaction; or there may be circumstances in evidence in connection with the matter, which satisfy the court of its falsity; the manner of the witness in testifying may impress the court with a doubt as to the accuracy of his statement and influence it to disregard his positive testimony as to a particular fact; and as it is within the province of the trial court to determine what credit and weight shall be given to the testimony of any witness, this court cannot control its finding or conclusion denying the testimony credence, unless it appears that there are no matters or circumstances which at all impair its accuracy." (*Davis* v. *Judson,* 159 Cal. 121, 128 [113 P. 147].) See also *Tretheway* v. *Tretheway,* 16 Cal.2d 133, 138 [104 P.2d 1033]; *Blank* v. *Coffin,* 20 Cal.2d 457, 461 [126 P.2d 868]. And a circumstantial showing of unreliability of that evidence need not exclude all other

possibilities. ▮ " 'It is not necessary, in order to establish a theory by circumstantial evidence, that the facts be such and so related to each other that such theory is the *only* conclusion that can fairly or reasonably be drawn therefrom . . .' (*Katenkamp* v. *Union Realty Co.*, 36 Cal.App.2d 602, 617 [98 P.2d 239].) ▮ The plaintiff relying on circumstantial evidence does not have to exclude the possibility of every other reasonable inference possibly derivable from the facts proved. (*Vaccarezza* v. *Sanguinetti*, 71 Cal.App.2d 687, 692 [163 P.2d 470]; *Spolter* v. *Four-Wheel Brake Serv. Co., supra* [99 Cal.App.2d 690 (222 P.2d 307)], at p. 694.)'' (*Sanders* v. *MacFarlane's Candies*, 119 Cal.App.2d 497, 500 [259 P.2d 1010].)

▮ The circumstantial evidence of decedent's intent in writing the letter of January 8th was such that opposing inferences could be deduced from it. The failure to call any witness to dispute the testimony of Sloan or Ramsey was significant and corroborative. This is not a case in which, as appellant claims, the court passed upon uncontradicted evidence favorable to proponent or made a wrong deduction of law from it. It is a case in which the trial judge's finding of the effect of conflicting evidence and divergent inferences is binding upon the appellate court.

The judgment is affirmed.

Shinn, P. J., and Vallée, J., concurred.